[No. G044479. Fourth Dist., Div. Three. May 3, 2012.]

BRENT BECKWITH, Plaintiff and Appellant, v.
SUSAN DAHL, Defendant and Respondent.

1042

1044

## COUNSEL

Markson Pico and Brett S. Markson for Plaintiff and Appellant.

The Arkin Law Firm and Sharon J. Arkin for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

The Walker Law Firm, Joseph A. Walker and Mary G. Finlay for Defendant and Respondent.

Arnold & Porter, Trenton H. Norris, Maria Chedid, Jeremy M. McLaughlin; National Center for Lesbian Rights, Shannon P. Minter and Christopher F. Stoll for National Center for Lesbian Rights as Amicus Curiae on behalf of Plaintiff and Appellant.

## OPINION

**O'LEARY, P. J.**—Brent Beckwith appeals from a judgment of dismissal entered after the trial court sustained without leave to amend Susan Dahl's demurrer to his complaint alleging intentional interference with an expected inheritance (IIEI) and deceit by false promise. Beckwith argues we should join the majority of other states in recognizing the tort of IIEI as a valid cause of action.[1] We agree it is time to officially recognize this tort claim. In addition, in this opinion we have clarified why IIEI and the cause of action, deceit by false promise, address different wrongs. We conclude Beckwith's complaint alleged sufficient facts to support a claim for deceit, but there are currently insufficient facts stated to allege IIEI. Given the unique circumstances of this case, Beckwith must be afforded an opportunity to amend the complaint if he believes he can allege the facts necessary to support an IIEI claim as delineated in this opinion. We reverse the judgment of dismissal and the order sustaining the demurrer. The matter is remanded for further proceedings.

### FACTS & PROCEDURE

1. *Marc Christian MacGinnis*

Beckwith and his partner, Marc Christian MacGinnis (MacGinnis), were in a long-term, committed relationship for almost 10 years. They leased an apartment together and were occasional business partners. MacGinnis had no children and his parents were deceased. His sister, Susan Dahl, with whom he had an estranged relationship, was his only other living family. At some point during their relationship, MacGinnis showed Beckwith a will he had saved on his computer. The will stated that upon MacGinnis's death, his estate was to be divided equally between Beckwith and Dahl. MacGinnis never printed or signed the will.

---

[1] This court invited amicus curiae briefing from the Consumer Attorneys of California, the Civil Justice Association of California, the Family Research Council, and the National Center for Lesbian Rights.

In May 2009, MacGinnis's health began to decline. On May 25, 2009, MacGinnis was in the hospital awaiting surgery to repair holes in his lungs. He asked Beckwith to locate and print the will so he could sign it. Beckwith went to their home and looked for the will, but he could not find it. When Beckwith told MacGinnis that he could not locate the will, MacGinnis asked Beckwith to create a new will so he could sign it the next day. That night, Beckwith created a new will for MacGinnis using forms downloaded from the Internet. The will stated: " 'I [(MacGinnis)] give all the rest, residue and remainder of my property and estate, both real and personal, of whatever kind and wherever located, that I own or to which I shall be in any manner entitled at the time of my death (collectively referred to as my "residuary estate"), as follows: (a) If Brent Beckwith and Susan Dahl survive me, to those named in clause (a) who survive me in equal shares.' "

Before Beckwith presented the will to MacGinnis, he called Dahl to tell her about the will and e-mailed her a copy. Later that night, Dahl responded to Beckwith's e-mail stating: " 'I really think we should look into a Trust for [MacGinnis]. There are far less regulations and it does not go through probate. The house and all property would be in <u>our names</u> and if something should happen to [MacGinnis] <u>we</u> could make decisions without it going to probate and the taxes are less on a trust rather than the normal inheritance tax. I have [two] very good friends [who] are attorneys and I will call them tonight.' [Emphasis added.]" After receiving the e-mail, Beckwith called Dahl to discuss the details of the living trust. Dahl told Beckwith not to present the will to MacGinnis for signature because one of her friends would prepare the trust documents for MacGinnis to sign "in the next couple [of] days." Beckwith did not present the will to MacGinnis.

Two days later, on May 27, MacGinnis had surgery on his lungs. Although the doctors informed Dahl there was a chance MacGinnis would not survive the surgery, the doctors could not discuss the matter with Beckwith since he was not a family member under the law. Nor did Dahl tell Beckwith about the risks associated with the surgery. Dahl never gave MacGinnis any trust documents to sign. After the surgery, MacGinnis was placed on a ventilator and his prognosis worsened. Six days later, Dahl, following the doctors' recommendations, removed MacGinnis from the ventilator. On June 2, 2009, MacGinnis died intestate. He left an estate worth over $1 million.

## 2. *The Probate Proceedings*

Following MacGinnis's death, Beckwith and Dahl met to discuss the disposition of MacGinnis's personal property. After Beckwith suggested they find the will that MacGinnis had prepared, Dahl told Beckwith "we don't need a will." Two weeks after MacGinnis's death, on June 17, 2009, Dahl

opened probate in Los Angeles Superior Court. Dahl verbally informed Beckwith that she had opened probate, but she did not send him any copies of the probate filings. In the filing, she did not identify Beckwith as an interested party. Dahl also applied to become the administrator of the estate.

In September 2009, Beckwith began to ask Dahl for details of the probate case. Dahl informed Beckwith that she had not had any contact with the probate attorney so she did not know anything. On October 2, 2009, Beckwith looked up the probate case online. He then sent Dahl an e-mail stating: " 'In case you hadn't had a chance to talk to speak [*sic*] with the probate attorney, I looked up [MacGinnis's] probate case on-line http://www.lasuperiorcourt.org/Probate/ and the next hearing date is not until 8/27/10, so unfortunately as expected it is going to take over a year from [MacGinnis's] passing until we get <u>our proceeds</u> from the estate.' [Emphasis added.]" When Dahl did not respond, Beckwith sent her another e-mail on December 2, 2009, asking if she needed any information from him regarding the distribution of MacGinnis's assets. Again, Dahl did not respond. Beckwith e-mailed Dahl again on December 18, 2009, asking about the probate proceedings. This time Dahl responded by e-mail, stating: " 'Because [MacGinnis] died without a will, and the estate went into probate, I was made executor of his estate. The court then declared that his assets would go to his only surviving family member which is me.' " A few weeks later, in January 2010, Dahl filed a petition with the probate court for final distribution of the estate. Beckwith filed an opposition to Dahl's petition in March 2010. After a hearing, at which Beckwith was present in pro se, the probate judge found that Beckwith had no standing because he was "not a creditor of the estate" and he had "no intestate rights" with regard to MacGinnis's estate.

### 3. *The Civil Action and Demurrer*

On July 30, 2010, while the probate case was still pending, Beckwith filed the instant civil action against Dahl alleging IIEI, deceit by false promise, and negligence. In the complaint, Beckwith asserted Dahl interfered with his expected inheritance of one-half of MacGinnis's estate by lying to him about her intention to prepare a living trust for MacGinnis to sign. Beckwith further alleged Dahl made these false promises in order to "caus[e] a sufficient delay to prevent [MacGinnis] from signing his will before his surgery" because she knew that if MacGinnis died without a will, she would inherit the entire estate. Finally, Beckwith claimed that as a result of his reliance on Dahl's promises, "he was deprived of his . . . share of [MacGinnis's] estate," and because he had no standing in probate court, a civil action against Dahl was his only remedy.

Dahl demurred to all three causes of action. As to the IIEI cause of action, she argued the "claim fails on its face" because "California does not

recognize a cause of action for 'interference with inheritance.' " Further, Dahl argued California should not recognize such a cause of action because doing so would "be inconsistent with already established legal principals embodied in the probate arena and other areas of the law." Dahl demurred to the fraud cause of action alleging her statements regarding the preparation of trust documents were too vague to constitute actionable fraud, Beckwith's damages were not caused by her statements, and Beckwith did not have a vested interest in MacGinnis's estate. Finally, Dahl's demurrer to the negligence claim alleged Beckwith had not pled the requisite duty or causation to state a claim.

At the hearing on the demurrer, the trial court stated, it was not "in a position to recognize" a new tort for IIEI because "that really is an appellate decision." Further, the court indicated it had concerns as to whether Beckwith had adequately pled the fraud cause of action, and thus, even if California did recognize the IIEI tort, Beckwith had not sufficiently alleged independently tortious conduct as required by other jurisdictions that do recognize the tort. The trial court sustained the demurrer without leave to amend as to all three causes of action and dismissed the complaint. Beckwith timely appealed the order sustaining the demurrer as to the first and second causes of action.

## DISCUSSION

### 1. *Standard of Review*

"A demurrer tests the legal sufficiency of the complaint, and the granting of leave to amend involves the trial court's discretion. Therefore, an appellate court employs two separate standards of review on appeal. [Citations.] First, the complaint is reviewed de novo to determine whether it contains sufficient facts to state a cause of action. [Citation.] In doing so, we accept as true the properly pleaded material factual allegations of the complaint, together with facts that may be properly judicially noticed. Reversible error exists only if facts were alleged showing entitlement to relief under any possible legal theory. [Citations.] [¶] Second, where the demurrer is sustained without leave to amend, reviewing courts determine whether the trial court abused its discretion in doing so. [Citations.] On review of the trial court's refusal to grant leave to amend, we will only reverse for abuse of discretion if we determine there is a reasonable possibility the pleading can be cured by amendment. Otherwise, the trial court's decision will be affirmed for lack of abuse. [Citations.]" (*Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497–1498 [57 Cal.Rptr.2d 406].)

### 2. *Intentional Interference with Expectation of Inheritance*

The trial court sustained without leave to amend Dahl's demurrer to Beckwith's first cause of action, IIEI, because the tort had not been officially

recognized as valid in California. However, "[t]he law of torts is anything but static, and the limits of its development are never set. When it becomes clear that the plaintiff's interests are entitled to legal protection against the conduct of the defendant, the mere fact that the claim is novel will not of itself operate as a bar to the remedy." (Prosser & Keeton, Torts (5th ed. 1984) § 1, p. 4, fn. omitted.) Therefore, the threshold question before this court is whether California should recognize a tort remedy for IIEI.

### a. *Background of the Tort*

The parties are in agreement that California has not yet recognized the tort of IIEI. However, "[t]wenty-five of the forty-two states that have considered it have validated it." (Klein, *"Go West, Disappointed Heir": Tortious Interference with Expectation of Inheritance—A Survey with Analysis of State Approaches in the Pacific States* (2009) 13 Lewis & Clark L.Rev. 209, 226 (hereafter *Go West*).) The United States Supreme Court called the tort "widely recognized." (*Marshall v. Marshall* (2006) 547 U.S. 293, 312 [164 L.Ed.2d 480, 126 S.Ct. 1735].) In addition, IIEI is outlined in section 774B of the Restatement Second of Torts. (Rest.2d Torts, § 774B ["One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift."].)

In general, most states recognizing the tort adopt it with the following elements: (1) an expectation of receiving an inheritance; (2) intentional interference with that expectancy by a third party; (3) the interference was independently wrongful or tortious; (4) there was a reasonable certainty that, but for the interference, the plaintiff would have received the inheritance; and (5) damages. (See, e.g., *Fell v. Rambo* (Tenn.Ct.App. 2000) 36 S.W.3d 837, 849.) Most states prohibit an interference action when the plaintiff already has an adequate probate remedy. (See, e.g., *Minton v. Sackett* (Ind.Ct.App. 1996) 671 N.E.2d 160, 162–163 (*Minton*).)

The question of whether or not California recognizes a cause of action for IIEI has been discussed in prior cases, but no court has explicitly decided whether California should recognize the tort. *Hagen v. Hickenbottom* (1995) 41 Cal.App.4th 168 [48 Cal.Rptr.2d 197], was the first published opinion that discussed the tort, but the court only briefly mentioned the interference cause of action to say it is "recognized in several states but not previously validated in California." (*Id.* at p. 173.) The court reversed the defendant's summary judgment award because the defendant failed to meet her statutory burden of showing the plaintiff could not establish his cause of action for, inter alia, intentional interference with an expected inheritance. However, the court

refused to explicitly address whether the interference tort claim was a valid one, explaining its holding did not mean the plaintiff's IIEI case was "necessarily meritorious." (*Id.* at p. 187.) This has led some commentators to suggest the court left open the possibility of a recovery based on this cause of action. (See *Go West, supra,* 13 Lewis & Clark L.Rev. at p. 226.)

Fifteen years later, in *Munn v. Briggs* (2010) 185 Cal.App.4th 578 [110 Cal.Rptr.3d 783] (*Munn*), a different division of this appellate district took up the issue of whether California should recognize the tort. The court extensively discussed the history and development of the tort in other states and acknowledged California had not yet adopted the tort. (*Id.* at pp. 585–587.) Ultimately, however, the court "decline[d] under the present circumstances to adopt the tort of interference with an expected inheritance" because the plaintiff "had an adequate remedy in probate . . . ." (*Id.* at p. 593.) Our Supreme Court has not ruled on the issue of whether California recognizes the tort.

### b. *Policy Considerations*

■ In order to decide whether a new tort cause of action should be recognized, we must consider the relevant policy considerations and balance the benefits of such recognition against any potential burdens and costs that recognition of the tort would bring. (See *Temple Community Hospital v. Superior Court* (1999) 20 Cal.4th 464, 471–478 [84 Cal.Rptr.2d 852, 976 P.2d 223] (*Temple*) [deciding whether to recognize the tort of intentional spoliation of evidence by third parties]; *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 8–18 [74 Cal.Rptr.2d 248, 954 P.2d 511] (*Cedars-Sinai*) [deciding whether to recognize the tort of intentional spoliation of evidence by first parties].)

■ The tort of IIEI developed under the "general principle of law that whenever the law prohibits an injury it will also afford a remedy." (*Allen v. Lovell's Administratrix* (1946) 303 Ky. 238 [197 S.W.2d 424, 426]; see *Morton v. Petitt* (1931) 124 Ohio St. 241 [177 N.E. 591, 593]; *Dulin v. Bailey* (1916) 172 N.C. 608 [90 S.E. 689, 690].) Similarly, it is a maxim of California jurisprudence that, "[f]or every wrong there is a remedy." (Civ. Code, § 3523.) In addition, in California, "[e]very person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his or her rights." (Civ. Code, § 1708.) "[W]e cannot let the difficulties of adjudication frustrate the principle that there be a remedy for every substantial wrong." (*Dillon v. Legg* (1968) 68 Cal.2d 728, 739 [69 Cal.Rptr. 72, 441 P.2d 912] (*Dillon*); see *Lucas v. Hamm* (1961) 56 Cal.2d 583, 589 [15 Cal.Rptr. 821, 364 P.2d 685] [holding that intended beneficiaries of wills can recover in tort against a negligent draftsman even

though there was a lack of privity because if such plaintiffs were precluded from bringing a tort claim, "no one would be able to do so and the policy of preventing future harm would be impaired"].) Recognition of the IIEI tort in California is consistent with and advances these basic principles.

One policy concern that stands out is the effect that recognition of the tort could have on the probate system. In California, as in many other states, "inheritance laws are ' "purely a creature of statute . . . ." ' " (*Munn, supra*, 185 Cal.App.4th at p. 589.) The probate system was created to protect a decedent's testamentary intent by imposing very stringent requirements on a will contest. (See Prob. Code, §§ 6111 [signature on holographic will must be in the testator's handwriting], 6110 [typewritten will must be executed and witnessed].) Recognition of the IIEI tort could enable plaintiffs to usurp a testator's true intent by bypassing these stringent probate requirements. The court in *Munn* explained, " 'If we were to permit, much less encourage, dual litigation tracks for disgruntled heirs, we would risk destabilizing the law of probate and creating uncertainty and inconsistency in its place. We would risk undermining the legislative intent inherent in creating the Probate Code as the preferable, if not exclusive, remedy for disputes over testamentary documents. [Citations.]' [Citation.]" (*Munn, supra*, 185 Cal.App.4th at p. 590, quoting *Wilson v. Fritschy* (Ct.App. 2002) 2002 NMCA 105 [132 N.M. 785, 55 P.3d 997, 1002].) These are very valid concerns that warrant this court's attention.

The *Munn* court looked to decisions from other jurisdictions in an attempt to " 'balance the competing goals of providing a remedy to injured parties and honoring the strictures of our probate code . . . .' " (*Munn, supra*, 185 Cal.App.4th at p. 587.) The court noted that " '[a] majority of the states which have adopted the tort of interference with an inheritance have achieved such a balance by prohibiting a tort action to be brought where the remedy of a will contest is available and would provide the injured party with adequate relief.' " (*Ibid.*, quoting *Minton, supra*, 671 N.E.2d at p. 162.) By applying a similar last recourse requirement to the tort in California, the integrity of the probate system is protected because where a probate remedy is available, it must be pursued. In addition, the only plaintiffs who will be able to utilize the tort are those who lack an adequate probate remedy *because of the interference of another*. In a sense, the interfering tortfeasor has "obtained the benefit of the testamentary intent rule by committing a tort against a third party . . . ." (*Allen v. Hall* (1999) 328 Or. 276 [974 P.2d 199, 203] (*Allen*).) Allowing those so harmed to bring a tort action "still would give defendants all the benefits that the testamentary intent rule calls for them to receive. Once possessed of those benefits, however, defendants would be liable to respond in damages for torts that they may have committed—a separate legal inquiry with its own societal justifications." (*Ibid.*)

Similar concerns led the California Supreme Court in *Temple* and *Cedars-Sinai* to hold a tort remedy for intentional spoliation was inappropriate. The *Cedars-Sinai* court cited, as one factor weighing against its recognition of an intentional spoliation tort, "the strong policy favoring use of nontort remedies rather than derivative tort causes of action to punish and correct litigation misconduct." (*Cedars-Sinai, supra,* 18 Cal.4th at p. 11.) In *Temple*, the court noted that "[r]egulatory, criminal, and disciplinary sanctions, as well as legislative measures and sanctions available to litigants within the scope of the original lawsuit, frequently are of more utility than tort litigation in accomplishing the goals of deterring and punishing litigation-related miscon-duct." (*Temple, supra,* 20 Cal.4th at p. 471.) Although there is a similar preference for bringing will contests in probate, there is an important difference between the nontort remedies already available to address litigation misconduct and the nontort remedies available through probate. In a trial setting, nontort measures, such as sanctions, attorney discipline, and criminal penalties, are available to every litigant. In contrast, as discussed above, the tort of IIEI is only available when the aggrieved party has essentially been deprived of access to the probate system.

Another common reason cited against recognition is that the IIEI tort is contrary to the principle that gratuitous promises are generally not enforce-able. (See *Economopoulos v. Kolaitis* (2000) 259 Va. 806 [528 S.E.2d 714, 720].) In California, a will is generally revocable by the testator at any time and for any reason prior to his or her death. (See *Crail v. Blakely* (1973) 8 Cal.3d 744, 747 [106 Cal.Rptr. 187, 505 P.2d 1027]; *Cook v. Cook* (1941) 17 Cal.2d 639, 646 [111 P.2d 322].) Likewise, a bare promise to make a gift in the future, in the absence of consideration, is not legally enforceable. (See *Coon v. Shry* (1930) 209 Cal. 612, 614–615 [289 P. 815].) Therefore, the argument goes, it would be inconsistent to allow a prospective beneficiary to recover against a third party for interfering with an expectancy when the prospective beneficiary could not legally enforce the same promise against the testator. However, California already recognizes other interference torts that protect only *expectancies* of future economic benefits that could not be enforced directly. (See *Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1144 [17 Cal.Rptr.3d 289, 95 P.3d 513] [interference with at-will employment rela-tions]; *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153 [131 Cal.Rptr.2d 29, 63 P.3d 937] [interference with prospective economic advantage]; *Speegle v. Board of Fire Underwriters* (1946) 29 Cal.2d 34, 39 [172 P.2d 867] [interference with at-will contract].)

For example, interference with an at-will contract is actionable even though there is only an expectation of future contractual relations because "it is the contractual relationship, not any term of the contract, which is protected against outside interference." (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1127 [270 Cal.Rptr. 1, 791 P.2d 587].)

Likewise, interference with an employment relationship is actionable even if the relationship is terminable at will because "the fact that the [employer] was privileged to discharge plaintiff at any time does not necessarily privilege a third party unjustifiably to induce the termination." (*Kozlowsky v. Westminster Nat. Bank* (1970) 6 Cal.App.3d 593, 598 [86 Cal.Rptr. 52].)

Closely related is the concern that an expectancy in an inheritance is too speculative to warrant a tort remedy because the testator may have changed his mind notwithstanding any interference from a third party. (See Prosser & Keeton, Torts, *supra*, § 130, pp. 1006–1007.) However, where there is a strong probability that an expected inheritance would have been received absent the alleged interference, whether or not the decedent changed his mind is a question of fact necessary to prove an element of the tort and is not a reason to refuse to recognize the existence of the tort altogether. (See *Allen v. Leybourne* (Fla.Dist.Ct.App. 1966) 190 So.2d 825, 829; *Bohannan v. Wachovia Bank & Trust Co.* (1936) 210 N.C. 679 [188 S.E. 390, 393–394]; Prosser & Keeton, Torts, *supra*, § 130, p. 1007.) Courts have dealt with this issue with respect to other interference torts by developing "a threshold causation requirement . . . for maintaining a cause of action . . . namely, proof that it is reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference." (*Youst v. Longo* (1987) 43 Cal.3d 64, 71 [233 Cal.Rptr. 294, 729 P.2d 728] (*Youst*).) As discussed above, a similar threshold requirement is built into the IIEI tort because one of the tort's required elements is that there exists a reasonable certainty that, but for the interference, the plaintiff would have received the inheritance.

Again, the court's analysis in *Temple* and *Cedars-Sinai* is instructive. In both cases, the court cited the inherently speculative nature of damages in spoliation cases as a reason to not recognize a tort for intentional spoliation. (See *Temple, supra*, 20 Cal.4th at pp. 474–476; *Cedars-Sinai, supra*, 18 Cal.4th at pp. 13–15.) "It seems likely that in a substantial proportion of spoliation cases the fact of harm will be irreducibly uncertain. In such cases . . . [t]he jury could only speculate as to what the nature of the spoliated evidence was and what effect it might have had on the outcome of the underlying litigation." (*Cedars-Sinai, supra*, 18 Cal.4th at pp. 13–14.) In contrast, an expectancy in an inheritance is not *inherently* speculative. Unlike in a spoliation case where "[a] litigant's expectancy in the outcome of litigation is peculiarly uncertain, being subject to the discretion of court and jury" (*Temple, supra*, 20 Cal.4th at p. 475), in an IIEI case there are many factual situations where it is possible for an aggrieved party to allege with reasonable certainty that, but for the interference of a third party, he would have inherited from the decedent. (See, e.g., *Nemeth v. Banhalmi* (1981) 99 Ill.App.3d 493 [55 Ill.Dec. 14, 425 N.E.2d 1187, 1191] [finding plaintiff, who alleged she was a beneficiary under two of decedent's prior wills, had established "an expectancy sufficient to maintain [an IIEI] action"].)

Dahl, relying on *Youst, supra,* 43 Cal.3d 64, and *Blank v. Kirwan* (1985) 39 Cal.3d 311 [216 Cal.Rptr. 718, 703 P.2d 58] (*Blank*), contends this court does not have the power to recognize an interference claim in the context of an expectation of inheritance because, in California, "the interests protected by the [interference] tort are business expectancies, and the tort is not to be extended to cover nonbusiness relations." However, a careful reading of the cases shows that no such blanket prohibition was ever set forth.

In *Youst,* the court held the "[d]eprivation of the *chance* of winning a horserace or any sporting event does not present a basis for tort liability for interference with prospective economic advantage." (*Youst, supra,* 43 Cal.3d at p. 83.) The court acknowledged the interests *generally* protected by interference torts are business expectancies; however, the court did not hold that *only* business expectancies could be protected by such torts. (*Id.* at p. 76.) In fact, while declining to recognize a cause of action for interference with a horseracing contest under the facts currently before it, the court acknowledged tort liability may be appropriate for interference with sporting events under some circumstances because "certain contests may have a higher probability of ultimate success than others." (*Ibid.*) In addition, the court cited the Restatement Second of Torts for the proposition "various possible situations may justify liability for interference with prospective economic benefits of a noncommercial character." (*Ibid.*) Taken as a whole, this Supreme Court opinion leaves open the possibility some nonbusiness expectancies may be protected by intentional interference torts.

Similarly, in *Blank, supra,* 39 Cal.3d 311, the California Supreme Court held the plaintiff's allegations the defendant interfered with his chance of receiving a poker permit from the city failed to state a cause of action for intentional interference with prospective economic advantage. (*Id.* at p. 330.) The court reached that result because the expectancies involved in the governmental licensing process are too uncertain to justify the expansion interference torts to include them. (*Ibid.*) However, as in *Youst,* the *Blank* court did not hold that all nonbusiness expectancies are too uncertain. In fact, one reason the court gave for its holding was that " 'no facts [were] alleged . . . showing that the plaintiff had any reasonable expectation of economic advantage which would otherwise have accrued to him . . . .' [Citation.]" (*Blank, supra,* 39 Cal.3d at p. 330.) Clearly, the court held open the possibility that where facts can be alleged showing that a nonbusiness relationship gives rise to a reasonable expectation of economic advantage, tort liability for interfering with that relationship may be appropriate.

But both *Youst* and *Blank* are very instructive for our purposes here. In each, the court reached its holding because of the highly speculative nature of the interest at stake and not merely because the expectancy arose from a

nonbusiness relationship. Both cite Prosser and Keeton's treatise for the proposition that interference torts have *traditionally* protected existing business relationships because " '[i]n such cases there is a background of business experience on the basis of which it is *possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered.'* [Citation.]" (*Youst, supra*, 43 Cal.3d at p. 75, quoting Prosser & Keeton, Torts, *supra*, § 130, p. 1006; see *Blank, supra*, 39 Cal.3d at pp. 330–331.) When no such relationship exists, such as in the context of a sporting event or the acquisition of a government permit, there is no possibility of satisfying the required threshold determination that it was "reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference." (*Youst, supra*, 43 Cal.3d at p. 71.)

As Prosser and Keeton points out, there is no essential reason "refusing to protect such non-commercial expectancies, at least *where there is a strong probability that they would have been realized.*" (Prosser & Keeton, Torts, *supra*, § 130, p. 1007, italics added.) Accordingly, many sister states considering the issue have recognized the tort because "[i]f the law protects a person from interference with an opportunity to receive a benefit by entering into contractual relations in the future, the same protection should be accorded to a person's opportunity to receive a benefit as a prospective legatee. The uncertainty attendant upon the expectancy is equivalent. Neither the employee nor the prospective legatee has any enforceable right to his likely benefit." (*Harmon v. Harmon* (Me. 1979) 404 A.2d 1020, 1023.) As discussed above, unlike the chance of winning at trial or the chance of winning a horserace, the chance of inheriting is not *inherently* speculative.

■ Synthesizing the above, we conclude that a court should recognize the tort of IIEI if it is necessary to afford an injured plaintiff a remedy. The integrity of the probate system and the interest in avoiding tort liability for inherently speculative claims are very important considerations. However, a court should not take the "drastic consequence of an absolute rule which bars recovery in all . . . cases" when a new tort cause of action can be defined in such a way so as to minimize the costs and burdens associated with it. (*J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 808 [157 Cal.Rptr. 407, 598 P.2d 60].) As discussed above, California case law in analogous contexts shields defendants from tort liability when the expectancy is too speculative. In addition, case law from other jurisdictions bars IIEI claims when an adequate probate remedy exists. By recognizing similar restrictions in IIEI actions, we strike the appropriate balance between respecting the integrity of the probate system, guarding against tort liability for inherently speculative claims, and protecting society's interest in providing a remedy for injured parties.

Further, California courts have frequently rejected the "contention that the rule permitting the maintenance of the action would be impractical to administer and would flood the courts with litigation [as being] but an argument that the courts are incapable of performing their appointed tasks . . . ." (*Emden v. Vitz* (1948) 88 Cal.App.2d 313, 319 [198 P.2d 696].) "Indubitably juries and trial courts, constantly called upon to distinguish the frivolous from the substantial and the fraudulent from the meritorious, reach some erroneous results. But such fallibility, inherent in the judicial process, offers no reason for substituting for the case-by-case resolution of causes an artificial and indefensible barrier. Courts not only compromise their basic responsibility to decide the merits of each case individually but destroy the public's confidence in them by using the broad broom of 'administrative convenience' to sweep away a class of claims a number of which are admittedly meritorious." (*Dillon, supra,* 68 Cal.2d at p. 737.)

### c. *Application to Beckwith's Complaint*

■ Having decided we can recognize a cause of action for IIEI, we turn to whether Beckwith sufficiently stated the cause of action in his complaint. To state a claim for IIEI, a plaintiff must allege five distinct elements. (*Munn, supra,* 185 Cal.App.4th at p. 588.) First, the plaintiff must plead he had an expectancy of an inheritance. It is not necessary to allege that "one is in fact named as a beneficiary in the will or that one has been devised the particular property at issue. [Citation.] That requirement would defeat the purpose of an expectancy claim. . . . It is only the expectation that one will receive some interest that gives rise to a cause of action. [Citations.]" (*Plimpton v. Gerrard* (Me. 1995) 668 A.2d 882, 885–886.) Second, as in other interference torts, the complaint must allege causation. "This means that, as in other cases involving recovery for loss of expectancies . . . there must be proof amounting to a reasonable degree of certainty that the bequest or devise would have been in effect at the time of the death of the testator . . . if there had been no such interference." (Rest.2d Torts, § 774B, com. d, p. 59.) Third, the plaintiff must plead intent, i.e., that the defendant had knowledge of the plaintiff's expectancy of inheritance and took deliberate action to interfere with it. (See *Carlson v. Warren* (Ind.Ct.App. 2007) 878 N.E.2d 844, 854.) Fourth, the complaint must allege that the interference was conducted by independently tortious means, i.e., the underlying conduct must be wrong for some reason other than the fact of the interference. (*Doughty v. Morris* (Ct.App. 1994) 117 N.M. 284 [871 P.2d 380, 383–384].) Finally, the plaintiff must plead he was damaged by the defendant's interference. (*Munn, supra,* 185 Cal.App.4th at p. 588.)

Additionally, an IIEI defendant must direct the independently tortious conduct at someone other than the plaintiff. The cases firmly indicate a

requirement that "[t]he fraud, duress, undue influence, or other independent tortious conduct required for this tort is directed at the testator. *The benefi-ciary is not directly defrauded* or unduly influenced; the testator is." (*Whalen v. Prosser* (Fla.Dist.Ct.App. 1998) 719 So.2d 2, 6, italics added (*Whalen*).) In other words, the defendant's tortious conduct must have induced or caused the testator to take some action that deprives the plaintiff of his expected inheritance. (Rest.2d Torts, § 774B, com. b, p. 58; see *Schilling v. Herrera* (Fla.Dist.Ct.App. 2007) 952 So.2d 1231 [defendant unduly influenced testator to execute a new will in her favor]; *Cardenas v. Schober* (2001) 2001 PA Super. 253 [783 A.2d 317, 326] [defendant's intentional failure to adhere to an agreement he made with testator to draft a will in favor of the plaintiffs constituted fraud and supported a claim for intentional interference with expected inheritance].) Even in the relatively few IIEI cases we found where the defendant's wrongful conduct was directed at someone other than the testator, the defendant's interference was never directed only at the plaintiff. (See *Allen, supra,* 974 P.2d at p. 205 [defendant interfered with testator's attempts to change his will by falsely telling testator's attorney testator was not lucid].)

██ We must also emphasize the tort of IIEI is one for wrongful interfer-ence with an expected inheritance and not an independent action for the underlying tortious conduct such as fraud or undue influence. The underlying tort is only the means by which the interference occurs. This distinction explains the development of the tort as one designed to provide a remedy for disappointed legatees. In the absence of an IIEI cause of action, when tortious conduct causing injury to an expected legatee is directed at the testator, the injured party has no independent action in tort. Thus, probate remedies developed to provide a remedy and method of challenging a tortiously induced bequest even when no independent tort action was available. (See Prob. Code, § 6104 ["The execution or revocation of a will or a part of a will is ineffective to the extent the execution or revocation was procured by duress, menace, fraud, or undue influence."].) Similarly, the tort of IIEI developed to provide a remedy when both of these avenues failed, i.e., when the plaintiff had no independent tort action because the underlying tort was directed at the testator and when the plaintiff had no adequate remedy in probate. "[T]he common law court has created this cause of action not primarily to protect the beneficiary's inchoate rights, but to protect the deceased testator's former right to dispose of property freely and without improper interference. In a sense, the beneficiary's action is derivative of the testator's rights." (*Whalen, supra,* 719 So.2d at p. 6.) Thus, when the defendant's tortious conduct is directed at the plaintiff, rather than at the testator, the plaintiff has an independent tort claim against the defendant and asserting the IIEI tort is unnecessary and superfluous. (See, e.g., *Dryden v. Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 998–999 [135 Cal.Rptr. 720] [refusing to allow an action

for interference with contractual relationship by one party to a contract against the other party because such an action is essentially one for breach of contract].)

Here, Beckwith alleged he had an expectancy in MacGinnis's estate that would have been realized but for Dahl's intentional interference. However, Beckwith did not allege Dahl directed any independently tortious conduct at MacGinnis. The only wrongful conduct alleged in Beckwith's complaint was Dahl's false promise to him. Accordingly, Beckwith's complaint failed to sufficiently allege the IIEI tort.

We must still decide "whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.]" (*Blank, supra,* 39 Cal.3d at p. 318.) We recognize that, in general, the plaintiff bears the burden of proving the trial court abused its discretion in denying leave to amend. (See *William S. Hart Union High School Dist. v. Regional Planning Com.* (1991) 226 Cal.App.3d 1612, 1621 [277 Cal.Rptr. 645].) However, "[l]iberality in permitting amendment is the rule . . . if a fair prior opportunity to correct the substantive defect has not been given. [Citations.]" (*Greenberg v. Equitable Life Assur. Society* (1973) 34 Cal.App.3d 994, 998 [110 Cal.Rptr. 470]; see *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 220–221 [197 Cal.Rptr. 783, 673 P.2d 660] (*CCTV*)[2] [disapproving trial court's denial of leave to amend because "without the guidance of this opinion, [plaintiff's] failure to make the specific amendments we now require is excusable"].) Under the circumstances here, Beckwith did not have a fair opportunity to correct the deficiencies with regard to his IIEI cause of action. The trial court found Beckwith's IIEI cause of action insufficient on its face, based on its conclusion the tort was not legally recognized in California. Accordingly, the court did not inquire into the sufficiency of the factual allegations supporting the IIEI claim. In light of the subsequent guidance provided by this opinion, we think it is appropriate Beckwith be given an opportunity to amend his complaint to address, if possible, the defects we have pointed out.

### 3. *Promissory Fraud*

The trial court also sustained without leave to amend Beckwith's second cause of action for deceit by false promise. Under Civil Code section 1709, one is liable for fraudulent deceit if he "deceives another with intent to induce him to alter his position to his injury or risk . . . ." (Civ. Code,

---

[2] *CCTV, supra,* 35 Cal.3d 197, was superseded by statute on another point as stated in *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 228 [46 Cal.Rptr.3d 57, 138 P.3d 207].

§ 1709.) Section 1710 of the Civil Code defines deceit for the purposes of Civil Code section 1709 as, inter alia, "[a] promise, made without any intention of performing it." (Civ. Code, § 1710, subd. 4.) " 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981] (*Lazar*).) Each element must be alleged with particularity. (*Conrad v. Bank of America* (1996) 45 Cal.App.4th 133, 156 [53 Cal.Rptr.2d 336].) As explained in more detail below, we conclude Beckwith's complaint sufficiently alleged each of the elements of fraud with the requisite specificity and particularity.

### a. *Misrepresentation*

██ "A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. [Citations.]" (*Lazar, supra,* 12 Cal.4th at p. 638.) Thus, in a promissory fraud action, to sufficiently alleges defendant made a misrepresentation, the complaint must allege (1) the defendant made a representation of intent to perform some future action, i.e., the defendant made a promise, and (2) the defendant did not really have that intent at the time that the promise was made, i.e., the promise was false. (*Id.* at p. 639.)

To sufficiently plead the first requirement, that the defendant made a promise, the complaint must state " '*facts* which "show how, when, where, to whom, and by what means the representations were tendered." ' [Citation.]" (*Lazar, supra,* 12 Cal.4th 631, 645.) As for the second requirement, the falsity of that promise is sufficiently pled with a general allegation the promise was made without an intention of performance. (See *Tyco Industries, Inc. v. Superior Court* (1985) 164 Cal.App.3d 148, 156 [211 Cal.Rptr. 540].) "The representation (implied) is that of the intention to perform [citation]; the truth is the lack of that intention. Purely evidentiary matters—usually circumstantial evidence or admissions showing lack of that intention—should not be pleaded. Hence, the only necessary averment is the general statement that the promise was made without the intention to perform it, or that the defendant did not intend to perform it." (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 725, p. 142.)

Beckwith's complaint alleged that on May 25, 2009, Dahl promised him, via e-mail and a telephone call, she would "promptly prepare and deliver trust documents to [MacGinnis] for him to sign, equally dividing [MacGinnis's] estate between [Dahl] and [Beckwith] in accordance with [MacGinnis's]

wishes." The complaint also alleged, "[Dahl] did not intend to perform this promise when it was made." Thus, the complaint clearly and specifically alleged (1) who made the promise, (2) to whom the promise was made, (3) where and when the promise was made, (4) by what means the promise was made, and (5) that the promise was made with no intention of performance. Accordingly, Beckwith's complaint sufficiently alleged the first element of promissory fraud, a false promise.

■ We reject Dahl's argument that because she did not specifically promise to present the trust documents to MacGinnis *before his surgery*, her statements were too vague or indefinite to constitute fraud. A demurrer merely tests the legal sufficiency of the pleadings. (*CCTV, supra*, 35 Cal.3d at p. 213.) The only requirement at the pleading stage is that the allegations must be pled with particularity and specificity. Beckwith has met this requirement because, as discussed above, the allegations in the complaint were not vague. Beckwith clearly alleged Dahl made specific promises to prepare and deliver trust documents to MacGinnis, but she did not intend to prepare them *at all* when she made that promise. Dahl is essentially arguing that Beckwith misunderstood her statements and misconstrued her intent. However, "[f]raudulent intent is an issue for the trier of fact to decide." (*Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1046 [135 Cal.Rptr.2d 736].) "It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct." (*CCTV, supra*, 35 Cal.3d at p. 213.)

It is certainly possible Dahl will be able to convince a jury she had every intention of preparing the trust documents for MacGinnis but he died before she could follow through. It is also possible Beckwith will not be able to convince a jury that Dahl had no intention of sharing MacGinnis's estate with him when she made her statements on May 25, 2009. But when reviewing an order sustaining a demurrer for failure to state a cause of action, "the question of plaintiff's ability to prove . . . [the] allegations, or the possible difficulty in making such proof does not concern the reviewing court [citations] . . . ." (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].)

#### b. *Knowledge of Falsity*

■ In a promissory fraud action, " 'the *essence* of the fraud is the *existence of an intent at the time of the promise* not to perform it.' " (*Building Permit Consultants, Inc. v. Mazur* (2004) 122 Cal.App.4th 1400, 1414 [19 Cal.Rptr.3d 562] (*Mazur*).) Therefore, the falsity of the promise and the knowledge of that falsity (scienter) are interconnected. A promise is only false if the promisor did not intend to perform the promise when it was made,

i.e., had knowledge of its falsity. (See *Lazar, supra*, 12 Cal.4th 631, 638.) Therefore, by sufficiently pleading Dahl's promise was false at the time she made it, Beckwith also sufficiently pled the element of scienter.

### c. *Intent*

██ "A fraudulent state of mind includes not only knowledge of falsity of the misrepresentation but also an ' "intent to . . . induce reliance" ' on it. [Citation.]" (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976 [64 Cal.Rptr.2d 843, 938 P.2d 903].) An " 'intent to deceive' is not an essential element of the cause of action . . ."; the required intent is an intent to induce action. (*Gagne v. Bertran* (1954) 43 Cal.2d 481, 488, fn. 5 [275 P.2d 15].)

Here, the complaint stated Dahl "intended that [Beckwith] rely on [her] promise by refraining from delivering to [MacGinnis] his will for [MacGinnis] to sign before his scheduled surgery." The complaint also alleged Dahl "made the promise to delay [MacGinnis's] execution of his will and to convince [Beckwith] to refrain from presenting [MacGinnis's] will to him for execution before the scheduled surgery." Thus, Beckwith's complaint alleged Dahl made promises to him with the intent to induce him to take the action of holding off on presenting MacGinnis with the will. Beckwith sufficiently pled the element of intent.

### d. *Causation*

██ "A plaintiff asserting fraud by misrepresentation is obliged to . . . ' "establish a complete causal relationship" ' between the alleged misrepresentations and the harm claimed to have resulted therefrom.' " (*OCM Principal Opportunities Fun, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 864 [68 Cal.Rptr. 828].) "The causation aspect of actions for damage for fraud and deceit involves three distinct elements: (1) actual reliance, (2) damage resulting from such reliance, and (3) right to rely or justifiable reliance." (*Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 513 [169 Cal.Rptr. 478] (*Younan*).) Thus, there are two causation elements in a fraud cause of action. First, the plaintiff's actual and justifiable reliance on the defendant's misrepresentation must have caused him to take a detrimental course of action. Second, the detrimental action taken by the plaintiff must have caused his alleged damage.

### 1. *Actual Reliance*

██ " '[A]ctual reliance occurs when a misrepresentation is " 'an immediate cause of [a plaintiff's] conduct, which alters his legal relations,' " and

when, absent such representation,' the plaintiff" "would not, in all reasonable probability, have entered into the contract or other transaction." ' " (*Hall v. Time Inc.* (2008) 158 Cal.App.4th 847, 855, fn. 2 [70 Cal.Rptr.3d 466].) To allege actual reliance with the requisite specificity, "[t]he plaintiff must plead that he believed the representations to be true . . . and that in reliance thereon (or induced thereby) he entered into the transaction. [Citation.]" (*Younan, supra*, 111 Cal.App.3d at p. 513.)

In his complaint, Beckwith expressly alleged he "believed that Dahl would prepare trust documents for [MacGinnis] to sign as she promised." In addition, he alleged "[Dahl] persuaded [Beckwith] by lulling [him] into a false sense of trust and . . . [¶] [i]n reliance on [Dahl's] false promise, [Beckwith] did not present [MacGinnis] with his will to sign before his scheduled May 27, 2009 surgery." Further, Beckwith alleged that because of his "trust in [Dahl] to help effectuate [MacGinnis's] wishes, [Beckwith] reasonably relied on [Dahl's] representation that she would have trust documents prepared and that no will was necessary." Thus, Beckwith alleged he believed Dahl's promises to be true and in reliance on that belief, he did not present MacGinnis with the will. He sufficiently pled actual reliance.

At the hearing on the demurrer, the trial judge expressed concern about whether Beckwith's complaint sufficiently alleged reliance. After asking Beckwith's attorney if there were "factual allegation[s] that could be set out to remedy the deficiencies that have been pointed out" as to the fraud cause of action, the court went on to state, "The one that I have really a concern about, which is raised, is the question of reliance. I mean, you have to rely, but the representations that are alleged to be made—and I'm not disputing whether—I have to assume the truth of the allegations that there are misrepresentations, but the reliance is the dead—it appears to the court that the reliance is directed to the deceased brother and partner because it is his conduct that is going to create the expectancy interest." When Beckwith's counsel pointed out that it was actually Beckwith who was relying on Dahl's promise, the court interjected, "But the promise is as to the deceased partner." Dahl's counsel also stated his confusion about the fraud claim stating, "As far as reliance, I had the same questions you did as far as who's relying on which promise from their complaint. But [Beckwith] said he's alleged the facts as best he can, and I don't think they're stated as far as reliance."

These statements indicate a marked confusion as to the elements required to state a claim for fraudulent deceit as well as demonstrate a general misunderstanding of the allegations in Beckwith's complaint. The false promise for which Beckwith seeks relief in count two of his complaint is Dahl's promise to him. Further, as discussed above, it is clear from Beckwith's

complaint that it is this promise upon which he relies. There is no discussion in the complaint of Dahl making a promise to MacGinnis, or MacGinnis, rather than Beckwith, relying on a promise. In fact, as discussed above in the analysis of the IIEI cause of action, if Beckwith can allege Dahl made a false promise to MacGinnis, he can sufficiently state a claim for IIEI. On the other hand, Beckwith's failure to allege Dahl's promise was made to MacGinnis does not affect his independent tort claim for fraud against Dahl. It appears the court was confusing the independent tort of fraud, as pled in count two of Beckwith's complaint, with the independently tortious conduct required for the IIEI tort, as pled in count one of Beckwith's complaint.

### 2. *Resulting Damage*

" ' "In an action for [common law] fraud, damage is an essential element of the cause of action." [Citation.] "Misrepresentation, even maliciously committed, does not support a cause of action unless the plaintiff suffered consequential damages." ' " (*Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1016–1017 [84 Cal.Rptr.3d 642].) Here, the complaint alleged that "[p]laintiff suffered economic harm in that he was deprived of his one half (1/2) share of [MacGinnis's] estate." "If the existence—and not the amount—of damages alleged in a fraud pleading is 'too remote, speculative or uncertain,' then the pleading cannot state a claim for relief." (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 202 [132 Cal.Rptr.2d 490, 65 P.3d 1255], quoting *Block v. Tobin* (1975) 45 Cal.App.3d 214, 219 [119 Cal.Rptr. 288] [finding fraud plaintiff could not recover lost profits because no facts were alleged showing plaintiff would have made a profit absent the fraud].) However, Beckwith's complaint clearly alleged facts showing that if he had presented MacGinnis with the will, it was very likely MacGinnis would have signed it, as well as facts alleging that had MacGinnis signed the will, Beckwith would have inherited half of the estate.

We acknowledge it is not enough for the complaint to allege damage was suffered. The fraud plaintiff must also allege his damages were caused by the actions he took in reliance on the defendant's misrepresentations. (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 364–365 [17 Cal.Rptr.3d 39].) " 'Assuming . . . a claimant's reliance on the actionable misrepresentation, no liability attaches if the damages sustained were otherwise inevitable or due to *unrelated causes*.' [Citation.]" (*Id.* at p. 365.) If the defrauded plaintiff would have suffered the alleged damage even in the absence of the fraudulent inducement, causation *cannot* be alleged and a fraud cause of action cannot be sustained. (See *Mazur, supra,* 122 Cal.App.4th 1400, 1415.)

In *Mazur, supra,* 122 Cal.App.4th 1400, the court held the plaintiff was incapable of alleging damages because even in the absence of the defendant's

fraud, the plaintiff would have suffered the same injury. (*Id.* at p. 1415.) The plaintiff entered into an agreement with another company, the insured, to assist that company in litigation against its insurer. (*Id.* at p. 1404.) Per the agreement, the plaintiff would take a percentage of any recovery. (*Id.* at p. 1405.) After the litigation settled, and the plaintiff was not paid its share of the recovery, the plaintiff sued the insurer, alleging, inter alia, the insurer's attorneys had fraudulently induced it to refrain from protecting its lien interest in the settlement. (*Id.* at pp. 1414–1415.) However, the insured had already successfully voided the underlying agreement because it violated certain statutory provisions. (*Id.* at p. 1414.) The court held that because the insured had voided the agreement, the plaintiff had no lien interest to protect. (*Id.* at p. 1415.) Thus, even if the plaintiff had taken legal steps to protect its lien interest, i.e., even in the absence of the fraud, it would have still been damaged because it never held a valid interest in the first place. (*Ibid.*) The fraud claim failed in *Mazur* because it was a *legal certainty* that the plaintiff would have lacked an enforceable interest, and thus would have been damaged, even without the fraudulent inducement caused by the defendant.

Here, Beckwith alleged in his complaint he "was harmed in that he was deprived of his one half (1/2) share of [MacGinnis's] estate, and [his] reliance on [Dahl's] false promise was a substantial factor in causing that harm." Dahl contends Beckwith's damages were not causally related to the alleged fraud because the actual cause of Beckwith's injuries was MacGinnis's failure to make a will. On demurrer, however, the appropriate inquiry is whether Beckwith would have suffered the alleged damages even if he had presented MacGinnis with the will. Beckwith has alleged a causal relationship between his actions induced by Dahl's promises and his resulting damage. In contrast to the facts of *Mazur*, there are no facts showing Beckwith would have been damaged even if he had presented MacGinnis with the will.

■ Dahl presents an argument, for the first time on appeal, that even if MacGinnis had signed the will, it would have been invalid. Dahl contends that because Beckwith drafted the will, even if MacGinnis had executed it, any donative transfers to Beckwith would have been invalid under sections 21350 and 21380 of the Probate Code.[3] According to section 21350, "[e]xcept as provided in [s]ection 21351, no provision, or provisions, of any instrument shall be valid to make any donative transfer to any of the following: [¶] (1) The person who drafted the instrument." (§ 21350, subd. (a)(1).) Similarly, section 21380 provides, in part, "A provision of an instrument making a donative transfer to any of the following persons is presumed to be the product of fraud or undue influence: [¶] (1) The person who drafted the instrument." (§ 21380, subd. (a)(1).)

---

[3] All further statutory references are to the Probate Code, unless otherwise indicated.

This argument is flawed for two reasons. First, as Beckwith points out in his reply brief, newly enacted section 21380 only became effective on January 1, 2011, and its provisions do not apply to wills that existed prior to that date. (§ 21392.) Section 21350 remains effective for wills that became irrevocable between 1993 and the time section 21380 became effective. (§ 21355.) Therefore, because MacGinnis died in 2009, had he signed the will prior to his death, it would have become irrevocable in 2009, and only section 21350 would apply. Second, although standing alone, section 21350 does invalidate donative transfers to the drafter of the will making the transfer, section 21351 provides that section 21350 does not apply when, inter alia, "[t]he transferor is . . . a cohabitant with . . . the person who drafted the instrument. For purposes of this section, 'cohabitant' has the meaning set forth in [s]ection 13700 of the Penal Code" (§ 21351, subd. (a)).[4]

" '[C]ohabitant' means two unrelated adult persons living together for a substantial period of time, resulting in some permanency of relationship. Factors that may determine whether persons are cohabiting include, but are not limited to, (1) sexual relations between the parties while sharing the same living quarters, (2) sharing of income or expenses, (3) joint use or owner-ship of property, (4) whether the parties hold themselves out as husband and wife, (5) the continuity of the relationship, and (6) the length of the relationship." (Pen. Code, § 13700, subd. (b).) Beckwith's complaint alleged he and MacGinnis were in a long-term relationship of 10 years, they leased an apartment together, and they owned a business together. Based on these facts, section 21350 would not have applied to invalidate the will had Beckwith presented it to MacGinnis. Unlike the plaintiff in *Mazur*, there is no legal certainty Beckwith would not have been damaged if he had given the will to MacGinnis. He has adequately pled that his damages, one-half of MacGinnis's estate, were caused by his failure to present MacGinnis the will to sign.

### 3. *Justifiable Reliance*

 In addition to pleading actual reliance, the plaintiff must set "forth facts to show that his or her actual reliance on the representations was justifiable, so that the cause of the damage was the defendant's wrong and not the plaintiff's fault." (5 Witkin, Cal. Procedure, *supra*, Pleading, § 732, p. 153.) There must be more pled than a simple statement plaintiff justifiably relied on the statements. (*Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 739

---

[4] Contrary to Beckwith's argument in his reply brief that section 21351, subdivision (d), provides a means of rebutting the presumption of undue influence that arises under section 12350, section 21351, subdivision (e)(1) clearly states that section 21351, subdivision (d) does not apply when the donative transfer in question is to the drafter of the instrument. (§ 21351, subds. (d) & (e).)

[29 Cal.Rptr. 201].) The complaint must contain "allegations of facts showing that the actual inducement of plaintiffs . . . was justifiable or reasonable. [Citations.]" (*Ibid.*, fn. omitted.)

Here, the complaint alleged that "[g]iven the circumstances, [MacGinnis's] condition, [Beckwith's] emotionally vulnerable state, and [Beckwith's] trust in [Dahl] to help effectuate [MacGinnis's] wishes, [Beckwith] reasonably relied on [Dahl's] representations that she would have trust documents prepared and that no will was necessary." Thus, the complaint contained specific allegations of facts showing why Beckwith's reliance on Dahl's promises was reasonable under the circumstances.

Dahl argues Beckwith's reliance on her promise was not justifiable because he "relied on a vague suggestion from a virtual stranger (who was purportedly estranged from the decedent at that time and had everything to gain by not having that will signed) that he should not have the decedent sign his already prepared will." However, the law is clear that " ' "[n]o rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool." ' " (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1667 [26 Cal.Rptr.3d 638] (*Boeken*).) " ' "Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent." [Citation.] "Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man." [Citation.]' " (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 684 [11 Cal.Rptr.3d 807].)

Conversely, a plaintiff's reliance is not reasonable when he " ' "put[s] faith in representations which are preposterous, or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth. . . ." [Citation.]' [Citation.]" (*Boeken, supra*, 127 Cal.App.4th at p. 1667.) " 'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.' " (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 [44 Cal.Rptr.2d 352, 900 P.2d 601].)

In this case, Dahl's alleged misrepresentations are not so preposterous or obviously false as to preclude tort liability. Beckwith has adequately pled that his reliance on Dahl's promises was reasonable under the circumstances. Therefore, Beckwith has alleged all the necessary elements of causation to sustain a claim for fraudulent deceit. He sufficiently alleged he was induced by his belief in Dahl's statements to refrain from presenting MacGinnis the will, that he was damaged in the amount of one-half of the estate as a result of that action, and that his reliance on Dahl's promises was justifiable.

Relying on *Hoeft v. Supreme Lodge K. of H.* (1896) 113 Cal. 91 [45 P. 185] (*Hoeft*), Dahl contends Beckwith has no remedy for the alleged misrepresentation because he had no vested property right in MacGinnis's estate. In *Hoeft*, children of the decedent claimed their stepmother, decedent's new wife, fraudulently induced their father to remove them as beneficiaries of an insurance policy. (*Id.* at p. 94.) But because the fraud was directed at the children's father, and "a right of action for fraud is personal and untransferable," the court held the children could not maintain a fraud action against their stepmother. (*Id.* at p. 96.) Further, unless the children had personally been injured by their stepmother's conduct, they could not maintain any other action in tort. The court reasoned the children had no contractual or statutory interest in the insurance policies at the time the fraud was committed because "[t]he beneficiary's interest is the mere expectancy of an incompleted gift which is revocable at the will of the insured . . . ." (*Ibid.*) Therefore, they suffered no damages because the fraud committed against their father did not work to deprive them of anything.

 Unlike the plaintiffs in *Hoeft*, Beckwith asserted a personal, tort cause of action against Dahl. "A tort, whether intentional or negligent, involves a violation of a *legal duty*, imposed by statute, contract, or otherwise, owed by the defendant to the person injured." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 6, pp. 48–49.) The complaint alleged Dahl violated the duty not to deceive Beckwith under Civil Code section 1709: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." In contrast, the defendant in *Hoeft* did not commit fraud against the plaintiffs, but rather against the decedent, so no similar statutory duty was violated. Thus, the *Hoeft* case is completely distinguishable from the instant action. Further, we have not found, and Dahl does not cite, any other cases suggesting one can recover damages for fraud *only* when he alters his position with respect to an already existing property interest. In fact, the cases support the opposite conclusion. (See *Pollack v. Lytle* (1981) 120 Cal.App.3d 931, 943 [175 Cal.Rptr. 81] ["It is true that a fraud action commonly seeks to recover pecuniary loss resulting from the invasion of a property interest. Yet . . . ' "[t]here is no essential reason to prevent a deceit action from being maintained, for intentional misstatements at least, where other types of interests are invaded . . . ." ' " (citation omitted)].)

Beckwith has sufficiently alleged all of the elements of promissory fraud with the required specificity to state a claim. Accordingly, we conclude the trial court erred in sustaining Dahl's demurrer.

## DISPOSITION

The judgment of dismissal is reversed and the matter remanded. The trial court is directed to overrule the demurrer to the promissory fraud cause of action and grant leave to amend the IIEI cause of action. Appellant shall recover his costs on appeal.

Rylaarsdam, J., and Ikola, J., concurred.