[No. B170797. Second Dist., Div. Three. Oct. 7, 2004.]

BUILDING PERMIT CONSULTANTS, INC., Plaintiff and Appellant, v. DAVID MAZUR et al., Defendants and Respondents.

## COUNSEL

James S. Link; Law Offices of Michael Anatole and Michael Anatole for Plaintiff and Appellant.

Law Offices of Louis J. Khoury, Louis J. Khoury; Law Offices of Nairie A. Balian and Nairie A. Balian for Defendant and Respondent David Mazur.

Shea Stokes & Carter and Jeffrey J. Leist for Defendant and Respondent Chapin, Shea, McNitt & Carter.

Gordon & Rees, Peter Schwartz and Jeffrey A. Evans for Defendant and Respondent Truck Insurance Exchange.

Reed Smith, James C. Martin, Lorenzo E. Gasparetti and Benjamin G. Shatz for Defendant and Respondent Crosby, Heafey, Roach & May.

Berger & Kahn, Sherman M. Spitz and Ryan C. Tuley for Defendant and Respondent Berger Kahn.

OPINION

CROSKEY, J.—The appellant, Building Permit Consultants, Inc. (BPC), appeals from a judgment entered after the defendants' several demurrers to the first amended complaint (hereafter, FAC) were all sustained without leave to amend. Among other things, the trial court concluded that BPC's multiple claims allegedly arose from, and were based upon, a voidable contract to provide public insurance adjuster services that were regulated and licensed by the Department of Insurance pursuant to Insurance Code sections 15006, 15007 and 15008.[1] Since BPC did not (and, in fact, could not) allege that it possessed the required license, and that failure had been raised and asserted as a defense to the enforcement of BPC's contract, the trial court concluded that the contract was void and all of the claims alleged by BPC necessarily failed.

After a review of the contract, which was attached as an exhibit to BPC's FAC, and the relevant Insurance Code provisions, we are satisfied that the trial court properly sustained the defendants' demurrers. We therefore will affirm the judgment.

## *FACTUAL AND PROCEDURAL BACKGROUND*[2]

The defendant and respondent, David Mazur, is the owner of two developed parcels of real property at 1233 and 1237 N. Fuller Avenue, Los Angeles, California (hereafter, the property). The property allegedly sustained some damage in the 1994 Northridge earthquake. Mazur, however, failed to make sufficient timely claim(s) to his insurer, the defendant and respondent, Truck Insurance Exchange (Truck).[3]

On July 27, 1997, Mazur entered into a written agreement with BPC entitled "Agreement For Litigation Support Services" (hereafter, the agreement). Under the terms of the agreement, Mazur retained "BPC to render the hereinafter described services in connection with [Mazur's] claim for insurance proceeds resulting from the damage or destruction to [Mazur's property] . . . ."

Specifically, the relevant provisions of the agreement stated: "(a) [Mazur] will retain the services of an attorney to litigate, arbitrate and/or negotiate

---

[1] Unless otherwise indicated, all statutory references are to the Insurance Code.

[2] As this matter comes to us after the sustaining of a demurrer, the facts that we recite are taken from BPC's FAC or otherwise appear to be not in dispute.

[3] This factual assertion is stated somewhat tentatively, as neither the FAC nor the parties' briefs have provided us with very much background. But this short summary appears, at least inferentially, to be accurate.

[Mazur's] claim with the insurance carrier. [¶] (b) [Mazur] retains BPC to support the attorney retained by [Mazur] by providing the following services: [¶] (i) BPC at the direction of [Mazur's] attorney will obtain the information and/or reports that the said attorney deems prudent or necessary to support [Mazur's] insurance claim. [¶] (ii) BPC will retain the services of a general building construction contractor and/or engineers (e.g. civil, structural, soil) and/or other consultants (which may include BPC), to prepare appropriate cost estimates, reports, plans and/or such other data and/or information that the attorney deems prudent or necessary. [¶] (c) BPC is not responsible for the contents of any report a consultant prepares on [Mazur's] behalf. BPC shall not be held liable for the negligence or intentional misconduct of any consultant retained pursuant to the terms of this Agreement. [¶] (d) Subject to BPC's prior written approval of the fee agreement between [Mazur] and the attorney, BPC will pay the costs and expenses charged to [Mazur] by said attorney on the terms agreed to by [Mazur]. [¶] (e) BPC shall not be responsible for the representation of [Mazur] in the event that [Mazur's] insurer files a cross-complaint or separate action against [Mazur]."

Under the terms of the agreement, Mazur agreed that BPC would be entitled to receive 27.5 percent of the net amount of all sums paid to Mazur by Truck on all portions of Mazur's claim after the date of the agreement. All costs and expenses incurred by BPC[4] would be deducted from the gross recovery from Truck and repaid to BPC, but would not be included in the recovery for purposes of calculating BPC's 27.5 percent share. This was a contingency arrangement and in the event of no recovery from Truck, then BPC would receive nothing (i.e., even the costs and expenses incurred by BPC would not have to be repaid). BPC was, however, to be fully paid out of first monies received from Truck even if this did not leave sufficient funds for Mazur to repair the earthquake damage to the property that had served as the basis for the claim.[5]

---

[4] The costs and expenses that the agreement anticipated would be incurred by BPC included (but were not necessarily limited to): (1) court filing fees; (2) process serving fees; (3) fees and mileage to private investigators; (4) fees to photographers or graphic artists; (5) experts for consultation and/or appearance at deposition or trial; (6) fees for obtaining attendance of other witnesses at deposition or trial; (7) fees to court reporters for taking deposition or copies of transcripts; (8) jury fees; (9) messenger and mail expenses; (10) traveling and lodging expenses for reaching out of town insurance people; (11) long distance telephone charges; (12) photocopying and telecopier charges. These costs and expenses do *not* include the fees that would be incurred by Mazur to hire the attorney with whom BPC, under the agreement, anticipated working.

[5] The agreement also contained a Cooperation Clause that provided: "5. COOPERATION. [Mazur] agree[s] to cooperate in the pursuit of the actions BPC and/or [Mazur's] attorney take on [Mazur's] behalf by providing necessary information, allowing inspections, producing documents, providing testimony and in such other ways as may be required. *In the event that [Mazur] refuse[s] to accept a settlement which BPC believes to be appropriate and in [Mazur's] best interest, [Mazur] shall be deemed to be not cooperating and BPC shall, upon*

It is not clear from the record what, if any, services were performed by BPC on Mazur's behalf, but it alleges that it provided some "funds" and, as a result, Truck "reopened" Mazur's claim. Truck retained a law firm to represent its interests, the defendant and respondent Berger, Kahn, Shafter, Moss, Figler, Simon & Gladstone (hereafter, Berger).[6]

On or about April 4, 2002, Mazur's earthquake claim was allegedly settled with Truck and the settlement proceeds were paid to Mazur.[7] BPC was neither involved in the settlement discussions nor informed as to the fact or terms of the settlement. Although BPC had, under the terms of the agreement, a lien right on any such proceeds and, allegedly had served notice of such right on Berger (who allegedly acknowledged such notice), nothing was ever paid in satisfaction of such lien.

As a result, on December 2, 2002, BPC filed its original complaint in this matter. In that pleading it alleged causes of action against Mazur, and all of the other defendants, for (1) breach of contract, (2) fraudulent concealment, (3) negligent concealment, (4) breach of equitable lien, (5) imposition of constructive trust, (6) conversion and (7) negligence. BPC did *not* attach a copy of the agreement to its original complaint nor did it characterize its contractual relationship as a provider of *services*. Rather, BPC generally alleged only that under its contract with Mazur it had agreed to "provide funds for the purpose of helping Mazur in Mazur's pursuit of insurance proceeds for damage to Mazur's real property, resulting from the 1994 earthquake in the Los Angeles area."

The several defendants, including Mazur, responded to this complaint with demurrers which, among other things, asserted that BPC had failed to attach a copy of the agreement in order to avoid the very issue of voidability that is now before us. The trial court sustained the demurrers with leave to amend on April 28, 2003.

---

*written notification to [Mazur], be entitled to withdraw from further representation of [Mazur]. In said event, BPC shall be entitled to: a) immediate reimbursement of all costs and expenses advanced on [Mazur's] behalf, and b) a lien on [Mazur's] claim in an amount equal to the total fee that would have been earned by BPC had [Mazur] settled as recommended by BPC plus the total amount advanced by BPC for costs and expenses which have not been reimbursed by [Mazur]. Further, [Mazur] shall be responsible for the amount of all costs and expenses which are required to further pursue [Mazur's] claim subsequent to the notification of [Mazur's] lack of cooperation."* (Italics added.)

[6] BPC alleges, on information and belief, that at some point in time, Berger was succeeded as counsel for Truck by *either* Crosby, Heafey, Roach and May (hereafter, Crosby) *or* Chapin, Shea, McNitt and Carta (hereafter, Chapin). Each of these law firms, along with Berger, (1) was named as a defendant in BPC's FAC, (2) successfully demurred to the FAC, and (3) is a respondent in this appeal.

[7] The record does not disclose the amount of this settlement; nor, indeed, does BPC anywhere allege the amount of the "funds" it allegedly spent on Mazur's behalf.

On May 7, 2003, BPC filed the FAC again alleging Mazur's claim for breach of contract, conversion and a common count for money had and received. Against Berger, it alleged a count for promissory fraud, intentional and negligent interference with contract, a common count for money had and received and conversion. Against Chapin and Crosby, BPC alleged counts for intentional and negligent interference with contract and conversion together with a count for money had and received.

Mazur and the other defendants again demurred. The principal objection that they asserted was that the agreement was now before the court and plainly demonstrated that it was a contract for services (not the mere "providing of funds") and that the services described in the agreement fell under the provisions of sections 15006–15008 which define, and require the Department of Insurance's regulation and licensure of, public insurance adjusters. The other defendants joined Mazur in this argument and raised two other issues. They contended that the action against the several attorneys failed to comply with Civil Code section 1714.10 (requiring a court order before filing an action charging an attorney for conspiring with a client) and Civil Code section 47, subdivision (b) (the litigation privilege).

On June 26, 2003, the trial court sustained these demurrers, on all three grounds, without leave to amend. On August 18, 2003, the court dismissed the FAC and entered judgment.[8] BPC thereafter filed this timely appeal.

---

[8] In its judgment, the trial court set out the basis of its ruling: "1. The contract between Building Permit Consultants and David Mazur was voidable under Insurance Code §§ 15006 and 15007 based upon the admitted failure of Building Permit Consultants, Inc. to obtain a valid public adjuster license. The Court ruled that the activities of Building Permit Consultants as described in the contract with David Mazur, attached to the 1st Amended Complaint as Exhibit 1, required a public adjuster license. The Demurrer by David Mazur demonstrated that David Mazur had elected to void the contract, and this precluded any recovery against all defendants. The Court noted that plaintiff's counsel admitted during the oral argument that the contract utilized by Building Permit Consultants, Inc. required that David Mazur hire an attorney and that attorney was required by the contract to utilize the services of Building Permit Consultants. This, together with the contingency fee recovery provided for in the contract which is not standard for expert witness retention, demonstrates that Building Permit Consultants acted independently of any attorney hired by David Mazur, and further demonstrates that Building Permit Consultants was required to obtain a public adjuster's license and that its failure to do so voids the contract. [¶] 2. Court denied plaintiff's request to file an amended complaint to attach letters obtained from the Department of Insurance on the grounds that any such letters should have been attached to Plaintiffs Opposition to the Demurrers, and that Court was not bound by conclusions of law or an administrative agency's determination on a legal issue. (See *A.M. Castle & Co. v. Franchise Tax Board* (1995) 36 Cal.App.4th 1794 [43 Cal.Rptr.2d 340].) [¶] 3. All causes of action directed against Defendants Chapin Shea McNitt & Carter, Crosby Heafy [*sic*] Roach & May, and Berger Kahn were disguised attempts to state claims for conspiracy between the law firms and their client, Truck Insurance Exchange. Therefore, all causes of action against these law firm defendants are barred by plaintiffs failure to obtain a court order prior to filing the complaint as required by Civil Code

## ISSUES RAISED

As BPC expressly states in its opening brief, "the pivotal and controlling question" presented in this matter is whether the FAC, and the agreement attached thereto as an exhibit, demonstrate that the services that BPC agreed to provide, and which serve as the fundamental basis for all of its claims, fall afoul of the provisions of sections 15006, 15007 and 15008. If they do, then the agreement is void and all of BPC's claims against all defendants, other than the promissory fraud claim, necessarily fail.

BPC contends that the services called for in the agreement are not subject to the Department of Insurance's regulation and license requirements and that the agreement is legal. BPC insists that the statute, when properly construed, should only be applied to one "who *directly* represents or acts on behalf of the insured in the negotiation or settlement of a claim" (italics added) and nothing alleged in the FAC reflects that BPC did any such acts.

█ The defendants, on the other hand, argue that the plain language of section 15007, which defines a "public insurance adjuster," is very broad and clearly encompasses the very services that BPC had promised in the agreement to provide.

We agree with the trial court and the defendants on this point. As a result we have no need to reach or discuss the issues raised by the attorney defendants under Civil Code sections 47, subdivision (b) and 1714.10.

## DISCUSSION

### 1. *Standard of Review*

█ "When reviewing a judgment dismissing a complaint after the granting of a demurrer without leave to amend, courts must assume the truth of the complaint's properly pleaded or implied factual allegations. [Citation.] Courts must also consider judicially noticed matters. [Citation.] In addition, we give the complaint a reasonable interpretation, and read it in context. [Citation.] If the trial court has sustained the demurrer, we determine whether the complaint states facts sufficient to state a cause of action. If the court sustained the demurrer without leave to amend, as here, we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. [Citation.] If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no

---

§ 1714.10. [¶¶ 4. The 4th cause of action for money had and received failed to state a valid claim. [¶¶ 5. There was no liquidated sum to which plaintiff undisputed rights, and therefore the cause of action for conversion of money could not be stated."

abuse of discretion has occurred. [Citation.] The plaintiff has the burden of proving that an amendment would cure the defect. [Citation.]" *(Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].)

The well-pled allegations that we accept as true necessarily include the contents of any exhibits attached to the complaint. Indeed, the contents of an incorporated document (in this case, the agreement) will take precedence over and supercede any inconsistent or contrary allegations set out in the pleading. In the case of such a conflict, we will look solely to the attached exhibit. *(Holland v. Morse Diesel International Inc.* (2001) 86 Cal.App.4th 1443, 1447 [104 Cal.Rptr.2d 239]; *Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604–605 [176 Cal.Rptr. 824].)

> 2. *The Insurance Code Contains Very Broad Provisions Regarding the Scope of the Public Adjuster Law*

Section 15007, in pertinent part, provides: "A public insurance adjuster within the meaning of this chapter is a person who, for compensation, acts on behalf of *or aids in any manner,* an insured in negotiating for or effecting the settlement of a claim or claims for loss or damage under any policy of insurance covering real or personal property or . . . any person who, for compensation, investigates, settles, adjusts, advises, or assists an insured with reference to claims for those losses on behalf of any public insurance adjuster." (Italics added.)

BPC's principal argument is that this language requires that a public insurance adjuster be one who *directly* represents or acts on behalf of the insured in the negotiation or settlement of a claim. We disagree.

Section 15007 is much broader than this. BPC's narrow reading of the statute is not justified by the language used. Section 15007 does not limit the definition of a public insurance adjuster to persons who only *directly* represent or act on behalf of the insured in the negotiation or settlement of a claim, but rather applies to anyone "who, for compensation, acts on behalf of or aids in any manner, an insured in negotiating for or effecting the settlement of a claim or claims for loss or damage under any policy of insurance . . . ." (§15007.) The statute does not use the word "directly," does not limit its scope to negotiations directly with insurance company personnel and, in fact, is drafted in broad terms so as to apply to anyone who "aids in any manner" an insured in negotiating for or "effecting the settlement of a claim."

██ The terms of the statute are broad, and concern all persons (except those listed in section 15008)[9] whose conduct or involvement impacts the resolution of the insurance claim. The breadth of such language sharply conflicts with the meaning that BPC argues that we should adopt which would limit the scope of the statute to one who actually talks directly to insurance company representatives and discusses the terms of a settlement. Further, the statute also requires licensing of those who receive compensation for services (investigate, settle, adjust, advise) or provide assistance to the insured with reference to claims.

As we read section 15007's definitional language, it casts a broad net. We assume that the Legislature in using such broad language did so advisedly. If it had intended a scope as narrow as BPC contends, it certainly could have articulated that intent.

### 3. BPC's Agreement with Mazur Calls for Performance of Services That Fall Within Section 15007

BPC insists that the agreement is only one for litigation support and that it was not agreeing to *directly* negotiate with Truck on Mazur's behalf. As we have already indicated, we will not read such a limited meaning into section 15007. Moreover, even a cursory review of the provisions of the agreement indicate that BPC was agreeing to something well beyond the simple provision of assistance to Mazur's attorney.

First, the agreement is between BPC and Mazur, not BPC and an attorney already retained by Mazur. Indeed, BPC conceded during oral argument that the agreement required Mazur to hire an attorney who would in turn contract with BPC for all of the services spelled out in the agreement. More

---

[9] In section 15008, the following categories of persons are excepted: "(a) An officer or employee of the United States of America or of the state or of a political subdivision thereof while the officer or employee is engaged in the performance of his or her official duties. [¶] (b) A charitable philanthropic society duly incorporated under the laws of this state which is organized and maintained for the public good and not for private profit. [¶] (c) An attorney at law in performing his or her duties as an attorney at law. [¶] (d) Admitted insurers, agents, and insurance brokers licensed by the state performing duties in connection with insurance transactions by them. [¶] (e) The legal owner of personal property which has been sold under a conditional sales agreement or a mortgagee under the terms of a chattel mortgage. [¶] (f) Any salaried office employee who performs exclusively clerical and administrative duties attendant to the disposition of the business regulated by this chapter. [¶] (g) Photographers, estimators, appraisers, engineers, and arbitrators, who are employed exclusively by a public insurance adjuster for the purpose of furnishing technical assistance to a licensed public insurance adjuster. [¶] (h) A private investigator licensed pursuant to Chapter 11.5 (commencing with Section 7512) of Division 3 of the Business and Professions Code while acting within the scope of that license."

significantly, BPC reserved the right to approve the fee agreement between Mazur and whatever attorney he did retain. BPC undertook to retain the services of the various kinds of experts and professionals who, under section 15008, are themselves excepted from the licensing requirement *when* they are employed by a licensed public insurance adjuster. Finally, if Mazur refused to accept a settlement that BPC "believes to be appropriate and in Mazur's best interest," BPC would be entitled to the immediate payment of all of its costs as well as a lien on Mazur's claim against Truck for 27.5 percent of the rejected settlement amount.

While we cannot determine from this record what services, *if any*, that BPC actually performed, it seems clear to us that the terms of the agreement called for more than mere litigation support. Certainly, the control that was given to BPC under the agreement over both attorney compensation and the settlement terms strongly suggests that something far different is going on here.

The author of the legislation that added sections 15007–15008 to the Insurance Code explained, in a letter to Governor Deukmejian on September 13, 1985, urging the Governor to sign Assembly Bill No. 1636 (1985–1986 Reg. Sess.), "The bill is designed to prevent some abuses which have been occurring in the field of public adjusting of insurance losses. As you know, 'public' adjusters represent the insured during the claims settlement process and they take a percentage of the loss payments for their services. Insurance proceeds are not increased to cover the fee of public adjusters. [¶] To enhance professionalism in the field of public adjusting and correct the abuses which have, on occasion, been taking place, the bill provides for the licensing of public adjusters and it would require all adjusting firms to demonstrate their qualifications to the Insurance Commissioner. [¶] It also enacts certain provisions ensuring that claimants are fully informed of the benefits and costs of public adjusting services and provides the claimant with the right to cancel the contract within 72 hours."

■ Sections 15006–15008 are part of the Public Adjusters Act. Enacted in 1986, the Public Adjusters Act established a statutory scheme to regulate the activities of persons and firms who make it their business to assist insureds to file and pursue claims with insurers after insured-against calamities. An analysis prepared by the Assembly Committee on Finance and Insurance, where the Public Adjusters Act originated, defined a public adjuster as "an individual who obtains, secures or enforces a client's claim against an insurance company for a fee." (Assem. Com. on Fin. and Ins., Rep. on Assem. Bill No. 1636 (1985–1986 Reg. Sess.) Apr. 21, 1985.) The goal of the Act, as articulated in this committee analysis and numerous others, was to

curtail unethical and abusive practices by some members of this then-new profession. The Senate Insurance Committee in reviewing the bill stated: "Historically, 'public' adjusters have presented danger to the public by 'chasing fires' and soliciting clients under conditions of duress. Further, where there has been [sic] problems with public adjusters steering repair or salvage work to specific contractors. A number of adjusters have come from the east coast where they have run afoul of the regulatory authority of those states." (Sen. Com. on Ins., Claims and Corps., Analysis of Assem. Bill No. 1636 (1985–1986 Reg. Sess.) July 17, 1985). In a letter to Governor Deukmejian, the author of the Public Adjusters Act reiterated many of the same concerns: "The bill is designed to prevent some abuses which have been occurring in the field of public adjusting of insurance losses. As you know, 'public' adjusters represent the insured during the claims settlement process and they take a percentage of the loss payments for their services. Insurance proceeds are not increased to cover the fee of public adjusters. [¶] To enhance professionalism in the field of public adjusting and correct the abuses which have, on occasion, been taking place, the bill provides for the licensing of public adjusters and it would require all adjusting firms to demonstrate their qualifications to the Insurance Commissioner. [¶] It also enacts certain provisions ensuring that claimants are fully informed of the benefits and costs of public adjusting services and provides the claimant with the right to cancel the contract within 72 hours."

■ This history demonstrates that the Legislature recognized that insureds would often be susceptible to exploitation in the wake of earthquakes, fires, floods, and similar catastrophes and that consumers of public adjusting services needed protection. In addition to price gouging and collusion with contractors, the Public Adjusters Act protects California consumers from a number of other abuses including high-pressure sales tactics, fraud, and incompetence. To ensure accountability and compliance with professional standards already in place for adjusters employed by the insurers, the Legislature included the licensure requirement as a part of the statutory scheme. In light of the consumer protection goals of the statute as a whole, we infer that the licensure requirement was aimed at any firm that might potentially exploit insureds in a vulnerable position by offering to help them through the insurance claim ordeal. It is, therefore, insignificant that BPC's business strategy does not precisely match the approach taken by other public adjusters which were in operation at the time the law was enacted. In our view, the agreement between BPC and Mazur is the very kind of transaction that the Legislature intended to control and regulate. It is not important for present purposes that BPC's services are characterized as litigation support and assistance. As already stated, BPC's agreement would give it effective

control over the client's attorney. Furthermore, the legislative history also indicates that one of the law's purposes was to prevent circumvention of existing professional standards. In a letter to the Governor, advocates of the bill stated: "It is very likely that some public adjusters operate without a license contending that current definitions do not apply to their practices." It would be improper and contrary to the clear legislative intent of the Public Adjusters Act to allow firms to bypass the licensure requirement and associated standards by packaging public adjusting services while still presenting the same dangers of dishonesty, sharp dealing, and incompetence to the consumer.

■■■ BPC argues that a ruling that anyone who does not *directly* handle an insured's claim is subject to the license requirement would lead to absurd results. BPC contends that the logic of such a ruling would compel application of the licensure requirement to anyone remotely involved in the insurance claims process, including auto body shops and building contractors, inasmuch as they furnish bills, estimates, and other documents used in adjusting claims. We disagree. A public adjuster's function is essentially to determine what services an insured needs and is entitled to after an insured-against event and then to help in achieving a full and fair settlement. Contractors and auto body shops merely provide a service without any reference to the event occasioning the need for that service. So long as they do not seek to involve themselves in the settlement negotiation process with their customers' insurers or represent that they will do so, businesses like these do not present the same consumer protection problems as do public insurance adjusters. Furthermore, in enacting the law, the Legislature foresaw the need to avoid confusion by exempting certain professionals commonly involved in the claims adjusting process from the licensure requirement. Among the exempt are photographers, estimators, appraisers, engineers and arbitrators employed by public insurance adjusters. (§ 15008, subd. (g).) However, these persons are only exempt when they are retained by a public adjuster who, in turn, must be licensed so that honesty and fair dealing are reasonably ensured. BPC's agreement with Mazur, in contrast, provides no safeguards of accountability, competence, or professionalism. As such, enforcing BPC's contract in this instance would undermine the regulation goals for public insurance adjusters which are at the heart of the legislation.

### 4. *BPC's Failure to Have Obtained a License Voids the Agreement*

Section 15006, subdivision (a), provides in pertinent part, "No person shall engage in a business regulated by this chapter, or act or assume to act as, or represent himself or himself to be, a licensee unless he or she is licensed under this chapter."

Section 15006, subdivision (b) provides, "Any contract for services regulated by this chapter that is entered into by an insured with any person who is in violation of subdivision (a) may be voided at the option of the insured, and the insured shall not be liable for the payment of any past services rendered, or future services to be rendered, by that person under that contract or otherwise."

■ Mazur has elected to void the agreement as there is no dispute that BPC has not alleged (and apparently cannot truthfully do so) that it was licensed at the time that the agreement was executed. Since the agreement is void and unenforceable, BPC has no claim for breach of contract against Mazur. Further, under the express language of section 15006, subdivision (b), BPC has no claim against Mazur of any kind based upon services rendered.

### 5. BPC's Promissory Fraud Claim Is Without Merit

■ Actionable deceit exists where a promise is made "without any intention of performing it." (Civ. Code, § 1710, subd. (4).) In a promissory fraud action, "the *essence* of the fraud is the *existence of an intent at the time of the promise* not to perform it." (*Benson v. Hamilton* (1932) 126 Cal.App. 331, 334 [14 P.2d 876].) "To maintain an action for deceit based on a false promise, one must specifically allege and prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing." (*Tarmann v. State Farm Mutual Auto Ins. Co.* (1991) 2 Cal.App.4th 153, 159 [2 Cal.Rptr.2d 861].) "The mere failure to perform a promise made in good faith does not constitute fraud." (*Merciful Saviour v. Volunteers of America, Inc.* (1962) 184 Cal.App.2d 851, 859 [8 Cal.Rptr. 48].)

In this case, BPC has alleged that Berger's agent signed a letter promising to honor BPC's purported contractual lien interest in Mazur's insurance settlement "without any intention to honor the promise that BPC's lien on the proceeds of any monetary resolution of the claim would be protected . . . ." At the time Berger promised it would protect BPC's lien, the agreement on which the lien was based was *voidable*, not void. As counsel to a party in the negotiation of the settlement agreement, Berger was in a position to know whether the parties planned to honor BPC's lien. Therefore, BPC might have justifiably relied on such a representation to its detriment. Although it is doubtful that Berger actually intended to defraud BPC in this manner (under

the terms of the agreement it had nothing to gain by denying BPC a share in the settlement), the mental state required for promissory fraud has been properly pleaded.

In addition to fraudulent intent, however, actionable deceit also requires damages resulting from reliance on a misrepresentation. (Civ. Code, § 1709.) " '[F]raud without damage is not actionable . . . .' " (*Furia v. Helm* (2004) 111 Cal.App.4th 945, 956 [4 Cal.Rptr.3d 357].) BPC's alleged theory of damages was that Berger's representation caused it to take no other steps to secure its lien interest. The flaw in this allegation is that the greatest damage BPC could have suffered in detrimental reliance on Berger's representation was the total loss of its lien. However, because Mazur chose to void the agreement, BPC had no lien to protect. Therefore, even assuming BPC's fraud allegations are true, the cause of action fails for the failure and inability to allege that any damages resulted from such fraud. This defect cannot be cured by amendment because BPC has expressly alleged in the FAC that, in reliance on Berger's representations, it "refrained from taking any legal action." That is, Berger's actions did not cause BPC affirmatively to incur any expenses, but rather passively to forgo an opportunity to prosecute a claim that we have concluded was baseless. Thus, BPC cannot allege that Berger did it any cognizable wrong.

### 6. *BPC Cannot Assert a Claim Based on Money Had and Received*

Section 15006, subdivision (b) provides: "Any contract for services regulated by this chapter that is entered into by an insured with any person who is in violation of subdivision (a) may be voided at the option of the insured, *and the insured shall not be liable for the payment of any past services rendered, or future services to be rendered, by that person under that contract or otherwise.*" (Italics added.) The statutory language only applies to "services rendered." In this case, BPC does not claim to have actually *performed* any services; it only provided funds. However, a fair reading of subdivision (b) is that it denies the unlicensed public adjuster from receiving *any* benefit from its activities. In addition to facing possible criminal sanctions for practicing without a license (§ 15053), unlicensed public adjusters do so at the risk of losing their investment. We see no reason to permit BPC to circumvent these statutory provisions by reliance on a common count theory.

## *DISPOSITION*

The judgment is affirmed.[10] The defendants shall recover their costs on appeal.

Klein, P. J., and Aldrich, J., concurred.

---

[10] We summarily reject BPC's procedural argument that the trial court should have granted it leave to file a second amended complaint alleging that the Department of Insurance had previously issued two letter "opinions" expressing the view that BPC did not have to be licensed. BPC, however, failed to provide a copy of those letters to the trial court or otherwise demonstrate that they were anything other than informal "private letters" issued by the Department with no precedential impact or effect. In short, the trial court was provided with no basis for concluding that the Department had ever taken any official action with respect to the issue of BPC's licensure obligation. BPC had an obligation to make some demonstration to the trial court that a further opportunity to plead a viable cause of action was truly justified. In the absence of such showing in its moving papers, we cannot say that the trial court abused its discretion in denying BPC further leave to amend. Moreover, we would not, in any event, be bound in our construction of the relevant Insurance Code sections by any opinion letters written to BPC by the Department. (See generally, *Robinson v. Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 234–235, fns. 6 and 7 [5 Cal.Rptr.2d 782, 825 P.2d 767].)