Filed 1/27/22; Certified for Pub. 2/18/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| KENNETH ALLEN WHITE, II, <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> SMULE, INC., <br><br>     Defendant and Respondent. | A161858 <br><br> (San Francisco County Super. Ct. No. CGC-19-574328) |

Labor Code[1] section 970 prohibits employers from inducing employees to relocate and accept employment by way of knowingly false representations regarding the kind, character, or existence of work, or the length of time such work will last. (§ 970, subds. (a), (b).)  Defendant Smule, Inc. (Smule) develops and markets consumer applications with a specialty in music social applications.  In this case, plaintiff Kenneth White alleges a violation of section 970 arising out of discussions he had with Smule prior to accepting a position with the company as lead project manager.

---

[1] All further statutory references are to the Labor Code unless otherwise indicated.

1

Section 970 requires the plaintiff to establish, among other elements, justifiable reliance and a knowingly false representation. (CACI No. 2710.) Smule moved for summary judgment, contending that White alleged false representations regarding the length of time his work at Smule would last, but evidence of an integrated, "at-will" employment agreement that White conceded he read, signed, and understood negated justifiable reliance as a matter of law. Smule also argued White could not establish that Smule made any knowingly false representations. The trial court agreed with Smule's first argument and granted summary judgment.

On appeal, White contends the trial court erroneously found that his undisputed "at-will" employment status meant that he could not establish justifiable reliance on alleged representations regarding the kind or character of work White would perform, rather than the length of time such work would last. Broadly construed, White's complaint encompassed allegations of false assurances of long-term employment as well as misrepresentations regarding the role White would fill at Smule. The "at-will" employment provision negated justifiable reliance on the former representations, but not the latter. The trial court's ruling therefore cannot stand, and Smule has not established entitlement to summary judgment on an alternative ground. Accordingly, we will reverse.

## BACKGROUND

### I. The Operative Complaint

In July 2018, Smule and White discussed the possibility of White working for Smule. In these discussions, Smule said it had significant problems with its development process, it was not operating efficiently, and its lack of an experienced project manager had inhibited its growth. Smule stated that it needed an experienced project manager who could train, supervise, and recruit other experienced project managers; it wanted White to develop a functional project management team that would enable Smule to grow its business; and it wanted White to join Smule to reorganize the company's project management operations and enable it to grow and operate more efficiently.

Smule's Vice President of Engineering, Alan Shang, elaborated: Shang needed a leader for project managers, and project teams and project responsibility need to be restructured; Shang hoped White could identify major deficiencies within 30 days and start bringing in competent personnel; Shang hoped reorganization would be substantially complete in one year, but understood it could take up to two years; and Shang wanted White to develop training protocols and manuals over the next couple of years. Shang said that if White could successfully reorganize the project manager operations, Smule's business would grow exponentially, and the need for White's skills would continue to evolve and his role would expand. White told Shang he wanted a director title, Shang agreed to a title of lead project manager, and Shang told White they would revisit the director

title in one year. After White said he was only interested in a secure, long-term position where he could grow with a company expanding its business, Shang said that was exactly what Smule was offering, Smule's employees were by and large long-term employees, and Smule offered a long-term opportunity and was a good place to work. Finally, Shang said Smule was intending a public offering (IPO) within the next year or two, and White would be hired to make Smule more efficient and help make the IPO a reality.

White alleged that Smule's representations "led [White] to reasonably conclude that his job position was long term," and Smule's representations induced him to resign from his employment in Washington and move his family to the Bay Area. Five months after White began work, Smule terminated him on the stated grounds that his job was being eliminated. White alleged, "The representations by [Smule to White] of the long-term nature of his job position were false and known to [Smule] to be false. [Smule] did not intend to abide by its statements assuring long term employment. It merely wanted to experiment with [White] and determine what immediate recommendations he would make. Purportedly eliminating his job position after 5 months was not supported by the operations of Defendant's business and the goals stated by Defendant."

## II.   The Motion for Summary Judgment

Smule moved for summary judgment, contending that White could not establish justifiable reliance or knowingly false representations.

4

### A. Smule's Evidence

In support of the first ground for its motion, Smule submitted White's executed employment offer stating, "Smule maintains an employment-at-will relationship with its employees. This means that both you and Smule retain the right to terminate this employment relationship at any time and for any reason. All compensation and benefits referred to in this letter are subject to your continued employment and satisfactory job performance. [¶] This offer letter constitutes our complete offer package. Any promises or representations, either oral or written, which are not contained in this letter are not valid and are not binding on Smule." In responses to requests for admission, White conceded he was an at-will employee and no one affiliated with Smule told him that he could only be terminated for cause. In deposition testimony, White admitted he signed and understood the documents stating his employment was at-will; no one explicitly promised him employment for a specific period of time or that he could not be terminated; and he understood he technically could be terminated at any time. Smule submitted declarations from David Steinwedel, the Smule employee who referred White, and from Shang stating they never communicated to White that he was anything other than an at-will employee; they never promised, committed, or represented to White that his employment would be long-term or of any specific duration; and they never promised that White would remain employed through a date when his stock options would vest.

5

### B. The Opposition

White opposed the motion. He argued that Smule's summary judgment motion missed the point because he did not allege a claim for wrongful termination. "The gravamen of [White's] Section 970 claim is that specific representations were made to him as to the nature, kind and character of the work he was being hired to perform, and the length of time the work would require." White contended that a jury could reasonably find that Smule never intended to have Plaintiff perform the job functions represented to him during his recruitment, and, instead, Smule intended to transfer these functions to a Bulgaria office that it had opened.

White did not dispute that he was an at-will employee, that Shang and Steinwedel had not represented otherwise, or that he read and understood his employment documents. White conceded that Shang and Steinwedel did not tell him that he could be terminated for cause only or promise him he would remain employed through a date when his stock options would vest.

White disputed that Shang had not committed or represented that White's employment would be long-term or for a specific duration. His response to Smule's undisputed material fact on this point stated, "Disputed. The projects, work and goals Shang wanted Plaintiff to complete were by th[eir] nature long term. Shang emphasized to Plaintiff that the work he needed Plaintiff to perform was essential to the long-term growth of Defendant. Plaintiff was not interested in short term projects

6

that would result in short term employment, and would not have accepted Defendant's offer of employment and moved his family . . . if he did not believe he was accepting a long term employment opportunity." White submitted a declaration stating Shang told him that: Smule was planning aggressive expansion over the course of the next few years and needed an experienced project manager to lead in building out and managing teams of project managers; White's experience would allow him to identify and optimize organization processes in engineering and products to make Smule's operations more efficient; Shang wanted White to upgrade project management tools, improve release management and localization processes, and train Smule's engineers in SCRUM/Agile methodologies; and Shang expected within 18 months to two years that White could hire and build out an entire group of project managers as the company expanded.[2]

In response to White's statement that he wanted stable, long-term employment, Shang stated he was looking for White to lead the project management efforts to facilitate multi-year expansion plans and employment with Smule would offer White

<hr/>

[2] Smule submitted objections to White's evidence that the trial court did not rule on. These objections were deemed overruled. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.) They are preserved for appeal (*ibid.*), but the burden is on Smule to renew any relevant objection by arguing the issue in its brief. Smule asks to "renew" the objections, but it merely cites the record below without advancing any argument. This is insufficient to raise an issue on appeal. (*Duffey v. Tender Heart Home Care Agency, LLC* (2019) 31 Cal.App.5th 232, 251, fn. 17.)

what he was looking for.  White also stated that Shang mentioned the Bulgaria office to him during interviews, and, in response to concerns White expressed about transferring engineering jobs to Eastern Europe, Shang said the Bulgaria office was merely to assist the San Francisco office, and Smule's plans included experienced project managers working in San Francisco.

## III.   The Trial Court's Ruling

The trial court granted summary judgment.  It ruled, "Defendant shows that it is undisputed that Plaintiff was an at-will employee and that any representations otherwise are unreasonably relied upon, meeting its burden to show that there are no triable issues of material fact.  Plaintiff does not meet its burden to refute."  The trial court also ruled, "In opposition, Plaintiff asserts that Defendant's misrepresentations and his reliance on them related to an entirely new and unpled set of facts, based on Defendant's purported undisclosed intention to transfer engineering functions to Bulgaria.  Plaintiff's argument is rejected.  ' "The function of the pleadings in a motion for summary judgment is to delimit the scope of the issues: the function of the affidavits or declarations is to disclose whether there is any triable issue of fact within the issues delimited by the pleadings." ' "

White timely appealed after the entry of judgment.

8

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant meets "his or her burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to the cause of action." (Code of Civ. Proc., § 437c, subd. (p)(2).) Where, as here, the defendant moves for summary judgment on the grounds that one or more elements of the plaintiff's claim cannot be established, the defendant must present evidence that either "conclusively negate[s] an element of the plaintiff's cause of action" or "show[s] that the plaintiff does not possess, and cannot reasonably obtain," evidence needed to establish an element of the claim. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853–854.) If the defendant meets this burden, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists as to the cause of action. (Code of Civ. Proc., § 437c, subd. (p)(2).)

The pleadings play a key role in a summary judgment motion. " 'The function of the pleadings in a motion for summary judgment is to delimit the scope of the issues' " and to frame "the outer measure of materiality in a summary judgment proceeding." (*FPI Development, Inc. v. Nakashima* (1991)

9

231 Cal.App.3d 367, 381.) The function of the affidavits or declarations is to disclose whether there is any triable issue of fact put in issue by the pleadings. (*Ibid*.) "Accordingly, the burden of a defendant moving for summary judgment only requires that he or she negate the theories of liability as alleged in the complaint; that is, a moving party need not refute liability on some theoretical possibility not included in the pleadings." (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493 (*Hutton*).) "In assessing whether the issues raised by plaintiff in opposing summary judgment are encompassed by the controlling pleading, we generally construe the pleading broadly [citation]; but the pleading must allege the essential facts ' " 'with reasonable precision and with particularity sufficient to acquaint a defendant with the nature, source and extent of [the] cause of action.' " ' " (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 585 (*Soria*).)

On appeal from a summary judgment, we "independently determine whether an issue of material fact exists and whether the moving party is entitled to summary judgment as a matter of law." (*Hutton*, *supra*, 213 Cal.App.4th at p. 493.) We identify the issues framed by the pleadings, determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in the moving party's favor, and then determine whether the opposition demonstrates the existence of a triable issue of material fact. (*Ibid*.) In doing so, we strictly construe the moving party's evidence and "liberally construe the evidence in support of the party opposing summary

10

judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037; *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 254.)

## II.  Section 970

As is relevant here, section 970 states:  "No person, or agent or officer thereof, directly or indirectly, shall influence, persuade, or engage any person to change from one place to another in this State or from any place outside to any place within the State, or from any place within the State to any place outside, for the purpose of working in any branch of labor, through or by means of knowingly false representations, whether spoken, written, or advertised in printed form, concerning either: [¶] (a) The kind, character, or existence of such work ;[¶] [or] (b) The length of time such work will last . . . ."[3]

---

[3] Section 970 provides in full, "No person, or agent or officer thereof, directly or indirectly, shall influence, persuade, or engage any person to change from one place to another in this State or from any place outside to any place within the State, or from any place within the State to any place outside, for the purpose of working in any branch of labor, through or by means of knowingly false representations, whether spoken, written, or advertised in printed form, concerning either: [¶] (a) The kind, character, or existence of such work; [¶] (b) The length of time such work will last, or the compensation therefor; [¶] (c) The sanitary or housing conditions relating to or surrounding the work; [¶] (d) The existence or nonexistence of any strike, lockout, or other labor dispute affecting it and pending between the proposed employer and the persons then or last engaged in the performance of the labor for which the employee is sought."

11

The Legislature enacted section 970 to protect migrant workers from abuses by unscrupulous employers, especially abuses involving false promises made to induce migrant workers to move in the first instance. (*Tyco Industries, Inc. v. Superior Court* (1985) 164 Cal.App.3d 148, 155.) However, section 970 is not restricted in application to farm labor or other mass hiring situations. (*Seubert v. McKesson Corp.* (1990) 223 Cal.App.3d 1514, 1522 (*Seubert*), disapproved on other grounds by *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 394, fn. 2 (*Dore*).) To prevail on a Section 970 claim, the plaintiff must prove: (1) the defendant made representations to the plaintiff about the kind or character of work, or the length of time the work would last; (2) the defendant's representations were not true; (3) the defendant knew when the representations were made that they were not true; (4) the defendant intended that the plaintiff rely on the representations; (5) the plaintiff reasonably relied on the representations and changed his or her residence for the purpose of working for the defendant; (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's representations was a substantial factor in causing his or her harm. (CACI No. 2710; *Funk v. Sperry Corp.* (9th Cir. 1988) 842 F.2d 1129, 1133 [section 970 rests on the tort of deceit].) Under section 972, any person who violates section 970 is liable for double damages resulting from such misrepresentations.

### III. Justifiable Reliance

With his section 970 claim, White contends that Smule, through Shang, made false representations to him during his

12

interview process that induced White to accept a job with Smule and move from Washington to California. In White's opposition to the motion for summary judgment below, the representations White contended were at issue fall into three groups: (1) representations that Smule's Bulgaria office would assist its operations in San Francisco, not replace them, and that Smule's plans going forward included experienced project engineers in San Francisco; (2) representations regarding "long-term employment" or the "long-term nature" of White's employment; and (3) representations regarding the kind and character of work White would be hired to perform—i.e., that Smule needed to, and intended to, employ White in a lead project manager role to manage other project managers, reorganize project management operations, and build and lead a functional project management team. As set forth below, White's "at-will" employment status does not, as a matter of law, negate justifiable reliance on Smule's purportedly false representations that it intended to employ and maintain someone in the lead project management position as described to White.[4]

White argues that Smule made misrepresentations during the hiring process "concerning the tasks he was being hired to perform, the goals he was to achieve, [and] the time it was

---

[4] Smule contends that the two representations about Smule's Bulgaria office that are set forth in White's additional undisputed material fact No. 36 (UMF No. 36) were unpled, and White refers to UMF No. 36 on appeal as adding a "new misrepresentation." Given our conclusion that Smule was not entitled to summary judgment, we need not address this issue.

13

expected for him to achieve [those] goals, all of which he relied upon in accepting Smule's employment offer." He continues, "A jury could conclude that [Smule] never intended to employ [White] for the purposes stated." In essence, White contends that Smule misrepresented that it intended to employ someone in the lead project manager position described to White. These are representations regarding the kind, character, or existence of work to be performed. (§ 970, subd. (a).) Smule, in contrast, paints this action as one concerning only false representations regarding the length of time White's position would last. (§ 970, subd. (b).) Thus, we turn first to the scope of White's section 970 claim.

Here, the operative complaint gave Smule fair notice of White's claim that Smule misrepresented the kind and character of White's work, in addition to the length of time his employment would last. Per the complaint, Smule represented that White would be hired as a lead project manager wherein he would supervise a team of project managers, identify operational deficiencies, and head up reorganization of project management operations. "[White] was establishing personnel and procedures to implement a high-quality project management team when he was abruptly terminated due to his 'job/role [ ] being eliminated.'" Further, White alleged that "[t]he representations by Defendant to Plaintiff of the long-term nature of his job position were false and known to Defendant to be false. Defendant did not intend to abide by its statements assuring long term employment. *It merely wanted to experiment with Plaintiff*

14

*and determine what immediate recommendations he would make. Purportedly eliminating his job position after 5 months was not supported by the operations of Defendant's business and the goals stated by Defendant.* The acts of Defendants were in violation of Labor Code Section 970." Read broadly, these allegations gave notice of a claim that Smule misrepresented it would employ someone in the lead project manager position as described (including "train[ing] and supervis[ing] project managers," "recruit[ing] experienced project managers," and "develop[ing] training protocols and manuals" for a "significant reorganization" of the project managers White would lead); it did not intend for White to fill such a role; and it hired White only to give input into Smule's deficiencies and then eliminated his job. That Smule had notice of a claim of this type is borne out by its questioning at White's deposition, during which Smule's counsel asked whether White had any facts to support a suggestion that Smule did not intend for White to perform the role described to him, and Smule's use of White's response to support its summary judgment motion on the issue of a knowingly false representation. (Cf. *Soria, supra*, 5 Cal.App.5th at p. 587 [once defendant is on notice of a claim through pleading, discovery provides the basis to learn the factual grounds for the theories of liability].)

Having concluded that this dispute fairly encompassed alleged false representations regarding the kind, character, or existence of work White was to perform, we turn to the question of whether White's conceded "at-will" status rendered any

15

reliance on Smule's representations unreasonable as a matter of law.

Preliminarily, we observe that, under *Dore, supra,* 39 Cal.4th 384, the trial court correctly found that White could not reasonably rely on purported promises of long-term employment. In *Dore,* the Supreme Court affirmed a grant of summary judgment for an employer where the employee alleged he was promised termination only for cause and indefinite employment so long as he performed in a competent manner, but he signed an "at-will" employment contract.[5] (*Id.* at pp. 393–394.) The court cited the employee's deposition testimony that no one specifically said he could be fired only for cause and he understood the terms of his employment, and the employee's employment letter, which stated his employment would be "at-will." (*Ibid.*) The court then held, "For all these reasons, we agree with the trial court that Dore's admission he signed AWI's letter stating his employment was at will and terminable at any time as a matter of law defeats any contention that he reasonably understood AWI to have promised him long-term employment." (*Id.* at p. 394.) Like the plaintiff in *Dore,* White conceded that no one at Smule told him he could be fired only for cause, that he would be employed for at least a year, or expressly promised

---

[5] During the interview process, the employee in *Dore* was told the employer needed someone to handle a new account on a "long-term basis"; if hired, the employee would " 'play a critical role in growing the agency' "; and the employer was looking for " 'a long-term fix, not a Band–Aid.' " (*Dore, supra,* 39 Cal.4th at p. 387.)

16

employment for a specific time; White executed an integrated agreement providing for "at-will" employment that could be terminated "any time and for any reason;" and he understood his agreement and the meaning of "at-will."[6]

We reach a different conclusion with respect to the alleged misrepresentation that White was hired to fill the role of lead project manager as described. Here, *Agosta v. Astor* (2004) 120 Cal.App.4th 596 (*Agosta*) is instructive. In *Agosta*, the court reversed a grant of summary adjudication of a promissory fraud claim where the employer misrepresented the length of employment and compensation terms. (*Id.* at pp. 602–607.) The court noted that an integrated, at-will employment provision rendered any reliance upon the alleged promise of long-term employment unjustified as a matter of law, but it held otherwise

---

[6] Authorities relied on by White do not change the lack of justifiable reliance on promises of long-term employment. In *Finch v. Brenda Raceway Corp.* (1994) 22 Cal.App.4th 547, 553, the court upheld a jury verdict under section 970 where the plaintiff established her employer had mispresented that her employment would be long-term, but an integrated, at-will provision was not at issue. *Lazar v. Superior Court* (1996) 12 Cal.4th 631 (*Lazar*) similarly did not address justifiable reliance or an integrated, at-will employment provision when it held the plaintiff stated a cause of action for fraudulent inducement based on the defendant's promise of long-term employment and assurances of the company's viability and future pay raises. (*Id.* at pp. 635–637, 649.) *Seubert* addressed an employer's misrepresentations regarding the character of a sales representative's job, rather than representations regarding the length of employment. (*Seubert, supra*, 223 Cal.App.3d at p. 1522.)

with respect to the promise regarding compensation terms. (*Id.* at pp. 606–607.) "[A]n 'at-will' employer does not have carte blanche to lie to an employee about any matter whatsoever to trick him or her into accepting employment." (*Id.* at p. 607.) Like the alleged misrepresentations regarding compensation terms in *Agosta*, an at-will employment provision does not, as a matter of law, establish that an employee's reliance on an employer's promises regarding the kind, character, or existence of work the employee was hired to perform is unreasonable. Because Smule failed to produce evidence showing that White could not establish justifiable reliance on this basis, it was not entitled to summary judgment. (*Id.* at pp. 606, 608 [reversing grant of summary adjudication on promissory fraud claim].)

## IV. Alternative Grounds for Summary Judgment

Smule contends that, even if we find the trial court's ruling was in error, we should affirm the ruling below on the grounds that White could not establish a knowingly false representation or actual reliance. (*Taylor v. Financial Casualty & Surety, Inc.* (2021) 67 Cal.App.5th 966, 980 [an appellate court affirms a trial court's decision if correct on any ground the parties had an adequate opportunity to address].) Smule is not entitled to summary judgment on either alternative ground.

### A. Knowingly False Representation

"California Labor Code [section] 970 . . . rests on the tort of deceit and the scienter requirement." (*Funk v. Sperry Corp.*, *supra*, 842 F.2d at p. 1133.) In a promissory fraud action, "the essence of the fraud is the existence of an intent at the time of the

18

promise not to perform it." (*Building Permit Consultants, Inc. v. Mazur* (2004) 122 Cal.App.4th 1400, 1414; *Lazar, supra,* 12 Cal.4th at p. 638.) The falsity of the promise and the knowledge of that falsity (scienter) are interconnected. (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1061–1062.) A promise is only false if the promisor did not intend to perform the promise when it was made, i.e., had knowledge of its falsity. (*Beckwith*, at p. 1062; see *Lazar*, at p. 638.) Therefore, the question is whether there is a triable issue of fact regarding whether Smule did not intend to perform the promises regarding what White would be employed to do when these promises were made.

### 1. Additional Relevant Evidence

Smule targeted the element of a knowingly false representation with its undisputed material fact No. 19 (UMF No. 19). UMF No. 19 states, "Where his counsel has allowed him to answer, White testified he does not have any facts to demonstrate that Defendant knew it was making false statements to him. Mr. White's counsel has repeatedly refused to allow him to testify as to whether he is aware of *any facts* to support the allegation in the FAC that Defendant made false statements knowing they were false." Smule relied on the following deposition testimony: Counsel asked, "Do you have any facts to support your suggestion that on the date you started, Smule had no intention of having you perform the role?" White responded, "In front of me right now, I can't say." White testified that he was not aware of any facts that Shang knew the statement that Smule would revisit the title of director in one

19

year was false when made. Smule also submitted deposition excerpts wherein White's counsel instructed him not to answer questions asking whether he had any facts to support various claims in his lawsuit.

Along with its moving papers, Smule submitted a declaration from Alan Shang, a prior Senior Vice President of Engineering. Shang stated that he interviewed White in the summer of 2018, that "Smule had a role that it hoped White would perform if he chose to accept the company's job offer," and Shang spoke with White about what he expected White's role would likely entail. He stated, "For a variety of reasons I ultimately concluded that [White] did not have the skills necessary to successfully perform the job for which he was hired. In addition to not accomplishing various tasks as I had hoped he might, his attitude was poor and I ultimately found him difficult to work and interact with." Shang terminated White because "in roughly January 2019, and based on a variety of factors, a decision was made that Smule no longer needed a project management function in its United States offices."

In opposition, White maintained that the falsity of the representations and Smule's knowledge thereof were established by Smule's plan, and execution thereof, to transfer engineering to Bulgaria. White submitted a declaration describing statements Shang made to him during recruitment regarding White's role. White stated that his duties of handling Internal Request (IR) matters and Royalties were transferred to an engineer in Bulgaria. White stated that his primary duty was to analyze

20

operations of Smule, identify inefficiencies, and develop plans for organizational improvement. By mid-January 2019, White had submitted to Shang a comprehensive, multi-year plan to improve Smule's product and engineering operations. Within two weeks, Smule terminated White, stating his job position was being eliminated. During the course of 2019, everyone White worked with was terminated, including Shang.

White also submitted the deposition testimony described below.

### a. Jeffrey Smith

White deposed Smule's CEO, Jeffrey Smith, on October 8, 2020. Smith was unsure of the date, but testified that Smule opened a Bulgaria office about two and a half years prior. The purpose of opening this office was to expand Smule's access to talent, but there was no focus on a particular role or talent.

Smule hired Eric Dumas, who lived in Sofia, Bulgaria, as its Chief Technology Officer (CTO) sometime after the prior CTO, Alex Li, left to start his own business. Dumas helped open the Bulgaria office, and prior to that, Smule had three engineers in Bulgaria. As of the date of Smith's deposition, the Bulgaria office had engineering, design, and marketing functions, and over 30 engineers. Smule tried an office in Minsk about 2017, and it transferred those roles to Bulgaria. Smith conceded that labor costs in Bulgaria, like other places, are lower than in San Francisco. When Dumas was hired, it was not Smule's intent to have him start teams "to cover all engineering functions." Rather, Smule's intent was to scale the workforce because small

companies have a hard time competing for talent in the Bay Area.

Smule underwent a restructuring about a year prior to Smith's deposition wherein it eliminated 39 people, including Shang. Certain roles and departments were eliminated. Engineering teams and project management in San Francisco were eliminated, but Smith testified there were currently engineers in San Francisco. Smule had to undergo restructuring to reduce its costs and remain solvent, and it planned the restructuring shortly before it happened. People at Smule were very disappointed they had to do a restructuring. It was not a plan. Smule did not lay off employees in Bulgaria.

At some point, Smule employed Mary Yang as chief product officer, and it let her go for performance issues. Her oversight of engineering was transferred to Dumas, and her oversight of other departments was transferred to Smith and another employee. Two engineering leaders, Shang and Ben Sfard, reported to Yang when she was at Smule. Sfard quit, and he was not replaced. Smule hired a woman in the Bay Area to replace Shang in the summer of 2020.

### b. Alan Shang

When Shang worked at Smule, he reported to Alex Li, then to Mary Yang, then to Eric Dumas.

At some point after learning of the opening of the Bulgaria office, Shang was informed engineering teams would be built there. Shang hired some of the initial engineering leaders for Bulgaria. Smule's broad categories of engineering teams

22

included server and web, mobile, data, supporting functionality, and project management.  Over time, engineering teams for server and web, mobile, data, and supporting functionality were established in Bulgaria.  Project management was not established there.  When the Bulgaria office opened, Smule had a full set of engineering teams in the United States.  These United States teams were not disbanded.  Before Shang left, the web development for Smule's website was transferred to Bulgaria, the build and release team was to be transferred there, and IR was transferred there to free up United States engineers to work on product features.  Shang worked with the CTO to transfer the web development, but he was not aware of a plan to transfer all engineering to Bulgaria.  In Bulgaria, Smule did not have a project management team and engineer managers performed those responsibilities.  When Shang was laid off, 20 to 30 of the engineering employees he supervised in the United States were let go.

Shang confirmed that he discussed with White the goals of the position to be filled by White during interviews.  Shang told White he wanted him "[t]o mange the projects.  That includes the timeline, working with different parties, solve dependencies, [and] align and allocate resources."  The long-term goals that Shang wanted White to achieve were to "build a strong project management team between the less senior project managers and between the engineering project management, in case Smule grew a lot bigger, to manage bigger projects across departments and across continents."  Counsel asked Shang, "So did you

23

envision the project management team expanding?" He responded, "I did not envision it going one way or another. There was the possibility for the project management team to expand. And if it did expand, we would have needed a bigger, stronger project management team." Smule had two project managers when White was hired. Shang terminated White because the role of the manager for the project management team was eliminated, but Shang denied having reached a conclusion that White did not have the requisite skills.

### c. David Steinwedel

Steinwedel was deposed on September 10, 2020. He referred White to Smule and believed Shang took over from there. At some point, Steinwedel was told that project management as a function was to be dissolved in the United States, and he testified the function was absorbed as part of the duties of the engineering directors that head each team of engineers. As of the date of his deposition, there were at least five engineering directors: four were in Bulgaria, and one was in San Francisco. Steinwedel was aware of one job position—client engineering—that was transferred to Bulgaria, as well as some instances of attrition where a couple product manager and designer spots were filled in Bulgaria. The client engineering team had consisted of approximately 15 employees in San Francisco who were let go.

### B. Analysis

As a preliminary matter, it appears the evidence Smule relied on in UMF No. 19 did not satisfy its burden of showing

24

White did not possess, and "[*could not*] *reasonably obtain*," evidence that Smule made promises with no intent to perform. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 854.) White may have lacked personal knowledge of the intent at issue, but that did not conclusively establish that he could not prove such intent. (See *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 749 (*Villa*) [burden did not shift in suit alleging conspiracy between defendant and plaintiff's insurer with testimony plaintiff was personally unaware of any communications between the two; there was no basis to believe plaintiff would have such personal knowledge].) Similarly, counsel's objection to what he deemed "legal contention" questions and his instruction to White not to answer did not satisfy Smule's burden. (*Gaggero v. Yura* (2003) 108 Cal.App.4th 884, 891–893 [defendant failed to show plaintiff lacked requisite evidence to shift burden where record disclosed only counsel's ill-taken privacy objections and instruction not to answer].)

Nonetheless, Shang's declaration, read with White's evidence, sufficiently filled the gaps, and shifted the burden. (*Villa*, *supra*, 35 Cal.App.4th at pp. 750–751 [in determining whether burden of proof has shifted, a court must consider all papers before it, including opposing party's evidence].) Shang provided evidence that Smule had a role in mind for White in the summer of 2018 when Shang and he discussed White's potential employment, Smule hoped that White would perform this role if he joined the company, Shang hoped White would succeed, and Shang talked to White about what the role would entail. White's

25

declaration sets forth the representations made by Shang regarding the role, and White submitted Shang's deposition testimony describing White's goals. In January 2019, Smule determined that it no longer needed a manager to manage the project management team, and White was terminated for this reason.

Looking to White's showing, the following responsive evidence created a triable issue of fact as to whether Smule knowingly misrepresented that White was hired to fill the role of lead project manager as described. Shang made clear when he interviewed White that Smule "*required*" an experienced project manager to lead in building out and managing teams of project managers. (Italics added.) Yet, only months after White started, his position was completely eliminated because Smule decided, based on an unexplained "variety of factors," the position was no longer needed in the United States.

During his time at Smule, White analyzed Smule's operations and developed a comprehensive, multi-year plan to improve Defendant's product and engineering operations. Smule did not dispute this, nor White's characterization of his plan as one "to improve Defendant's product and engineering operations." Within two weeks of White's submission of this plan, he was terminated. White stated Shang was impressed by his plan, and the plan was ready for implementation by Smule's engineering department. Moreover, conflicting statements exist regarding the circumstances of White's termination. Smule presented as undisputed material facts certain statements from Shang's

26

declaration, in which Shang stated he ultimately concluded White did not have the skills necessary to successfully perform the job for which he was hired, White did not accomplish various tasks as Shang had hoped, and White was difficult to work with. White controverted this showing with Shang's deposition testimony, wherein Shang denied having concluded that White did not have the skills necessary to be a lead program manager and Shang stated that the reason for White's termination was the elimination of his job position. Taken together, a reasonable trier of fact could infer from this circumstantial evidence that Smule never intended to employ someone in the lead project manager position as represented to White, instead desiring nothing more from White than a consultation or improvement plan on how Smule could enhance its operations.[7]

### C. Actual Reliance

Finally, we decline Smule's invitation to affirm the ruling below based on White's alleged lack of actual reliance. Even if we may affirm a summary judgment on a ground not relied upon by the trial court, it must be a "ground that the parties had an adequate opportunity to address in the trial court." (*Securitas Security Services U.S.A., Inc. v. Superior Court* (2011) 197 Cal.App.4th 115, 120.) Smule did not move for summary judgment based on White's inability to establish actual reliance,

---

[7] Having found a triable issue of fact as set forth above, we need not discuss White's contention that a triable issue of fact exists because the falsity of the representations Smule made and Smule's knowledge thereof "are established by [Smule's] plan and execution thereof to transfer engineering functions to Bulgaria."

so Smule did not meet its burden of showing summary judgment was warranted, and the parties had no opportunity to present evidence appropriately on the issue.  In these circumstances, it would be improper for us to affirm the trial court's summary judgment ruling on this basis.

## DISPOSITION

The judgment is reversed.

BROWN, J.

WE CONCUR:

POLLAK, P. J.
STREETER, J.
*White v. Smule, Inc.* (A161858)

28

Filed 2/18/22

# CALIFORNIA COURT OF APPEAL
## FIRST APPELLATE DISTRICT
## DIVISION FOUR


KENNETH ALLEN WHITE, II,
    Plaintiff and Appellant,
    v.
SMULE, INC.,
    Defendant and Respondent.

A161858
San Francisco County
Sup. Ct. No. CGC19574328


BY THE COURT:

        The written opinion which was filed on January 27, 2022, has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and it is ordered published in the official reports.



Date:_____    _____P.J.
                                                        J. Pollak

Trial Court:   San Francisco City & County Superior Court

Trial Judge:   Hon. Ethan Schulman

Counsel:   Law Offices of Lipow & Harris, Jeffrey Lipow; Law Offices of Durham & Ng and Jonathan Durham for Plaintiff and Appellant.

Gattey Law Office and Scott D. Gattey for Defendant and Respondent.

*White v. Smule* (A161858)

2